UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JUANEA L. BUTLER, et al. | * | Civil Action No. 2:18-cv-06685 |
| | * | |
| Plaintiffs | * | Section "F"(4) |
| | * | |
| v. | * | Judge: Martin L. Feldman |
| | * | |
| DENKA PERFORMANCE | * | Magistrate: Karen Wells Roby |
| ELASTOMER LLC et al. | * | |
| | * | |
| Defendants | * | |
| | * | |

**********************************************

## SECOND AMENDED CLASS ACTION PETITION

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff JUANEA L. BUTLER, individually and as representative of all others similarly situated (hereinafter referred to as "Putative Class"), who files this Second Amended Class Action Petition, amending her original Class Action Petition (hereinafter referred to as "Original Petition")[1] and First Amending Class Action Petition (hereinafter referred to as "First Amending Petition"),[2] as follows:

## I.   PARTIES

### A.  Plaintiffs

1.      **Juanea L. Butler** (hereinafter referred to as "Plaintiff") is a person of full age of majority, and domiciliary of the State of Louisiana, who meets the class definition more fully described herein below, as she worked and resided in the defined areas during the applicable timeframe, and she has experienced the symptoms and/or medical conditions and/or illnesses; and exposure referenced in the said class definition. Plaintiff brings this action individually and on behalf of all other individuals meeting said class definition (hereinafter referred to as "Putative Class").

---

[1] *See* Rec. Doc. 1-1 at 13-44.
[2] *See* Rec. Doc. 1-1 at 1-3.

EXHIBIT
A

### B.  Defendants

2.     **DENKA PERFORMANCE ELASTOMER, LLC** (hereinafter referred to as "Denka")
is a limited liability company who, during all material times hereto, has dual citizenship in the
State of Delaware as its place of incorporation and the State of Louisiana as its principal place of
business; who is licensed to do and is doing business in the State of Louisiana. On or around
November 1, 2015, Denka purchased DuPont's Chlorobutadiene ($C_4H_5Cl$) and
polychloroprene/neoprene (hereinafter "neoprene") manufacturing business and units at the
Pontchartrain Works Facility, 560 Highway 44, LaPlace, LA 70068 (hereinafter referred to as
"PWF"), both which its stills owns and operates.

3.     **E.I. DUPONT DE NEMOURS AND COMPANY** (hereinafter referred to as "DuPont"),
who, during all material times hereto, has dual citizenship in the State of Delaware as its place of
incorporation and the State of Louisiana as its principal place of business; who is licensed to do
and is doing business in the State of Louisiana. DuPont owned and operated the entire PWF from
1969 to 2015; and owned the polychloroprene/neoprene (hereinafter "neoprene") manufacturing
business from 1969 to 1996, and again from 2012 until said 2015 sale to Denka. During the sale,
except for the neoprene manufacturing units of the PWF (hereinafter "neoprene units"), DuPont
retained ownership of the entirety of the PWF land and buildings, including the building where it
currently manufactures Kevlar.

4.     **DUPONT PERFORMANCE ELASTOMERS, LLC f/k/a DUPONT DOW
ELASTOMERS, LLC** (hereinafter collectively referred to as "DPE"), is a limited liability
company who, during all material times hereto, has dual citizenship in the State of Delaware as its

place of incorporation and the State of Louisiana as its principal place of business; is licensed to do and is doing business in Louisiana. DuPont Dow Elastomer, LLC (hereinafter "DDE") was a joint venture of DuPont and the Dow Chemical Company for the Chlorobutadiene $(C_4H_5Cl)$/neoprene manufacturing business, operating DuPont's PWF from 1996 to 2005 as the sole manufacturer in the U.S and the world's largest manufacture of neoprene. In 2005, DDE changed its name to DuPont Performance Elastomers, LLC (hereinafter "DPE") and became a wholly owned subsidiary of DuPont. DPE owned and operated the PWF until 2012, when the PWF and business reverted back solely to DuPont.

5.      **STATE OF LOUISIANA, THROUGH THE DEPARTMENT OF HEALTH** (hereinafter referred to as "DHH"), a state agency and department[3] within the executive branch of state government for the State of Louisiana; and a body corporate with the right to sue and be sued[4] and to hold and use property.[5]

6.      **STATE OF LOUISIANA, THROUGH THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY** (hereinafter referred to as "DEQ"), a state agency and department[6] within the executive branch of state government for the State of Louisiana; and a body corporate with the right to sue and be sued[7] and to hold and use property.[8]

7.      **JORGE LAVASTIDA** (hereinafter referred to as "Lavastida"), a person of the full age of majority and domiciliary of the State of Louisiana; who was the plant manager for DuPont through the aforementioned 2015 sale to Denka; and is now the plant manager of Denka's neoprene units.

---

[3] La. R.S. § 36:3(1)
[4] La. R.S. § 36:1 *et seq*.; La. R.S. §§ 36:4, 36:251.
[5] La. R.S. §§ 36:251; 36:231.
[6] La. R.S. § 36:3(1)
[7] La. R.S. § 36:1 *et seq*.; La. R.S. §§ 36:4, 36:231.
[8] La. R.S. §§ 36:251; 36:231.

Lavastida is the designated "Permit Responsible Official (hereinafter "PRO") on the permits issued by DEQ that apply to Denka's neoprene manufacturing business and PWF units.

8.    **PATRICK WALSH** (hereinafter referred to as "Walsh"), is a person of the full age of majority and domiciliary of the State of Louisiana, who is the current Safety, Health, and Environmental Manager (hereinafter "SHE") over Denka's neoprene units of the PWF; and who was employed under the same title and capacity for DuPont until the 2015 sale to Denka.

9.    **IVAN CALDWELL** (hereinafter referred to as "Caldwell"), is a person of the full age of majority and domiciliary of the State of Louisiana, who was the former DuPont PWF plant manager and designated PRO on the permits issued by DEQ that governed DuPont's neoprene production there during parts of 2014 and 2015.

10.    **WALTER GLENN** (hereinafter referred to as "Glenn"), is a person of the full age of majority and domiciliary of the State of Louisiana, who was the former DuPont PWF plant manager and designated PRO on the permits issued by DEQ that governed DuPont's neoprene production from approximately 2011 to 2014.

11.    **DAVID PIGEON** (hereinafter referred to as "Pigeon"), is a person of the full age of majority and domiciliary of the State of Louisiana, who was the DuPont PWF plant manager and designated PRO on the permits issued by the DEQ that governed DuPont's neoprene production from approximately 2003-2010.

12.    **DORIS GREGO** (hereinafter referred to as "Grego"), is a person of the full age of majority and domiciliary of the State of Louisiana, who was employed by DuPont at the PWF from 1990 until the 2015 sale to Denka; and who, while employed by DuPont, was responsible for environmental issues and safety, air emissions and controls, DEQ inspections and compliance, and air and chemical-permitting issues, among other things. After DuPont's 2015 sale of the neoprene

manufacturing business to Denka, Grego became employed by Denka as its Senior Environmental Consultant for the 2016 inspection performed by the United States Environment Protection Agency (hereinafter referred to as "EPA") at the PWF.

## II.    JURISDICTION AND VENUE

13.    Plaintiffs originally filed this action in the 40th Judicial District Court for the Parish of St. John the Baptist, State of Louisiana, where venue was proper pursuant to La. C.C.P. arts. 74 and 593 because Defendants engaged in wrongful conduct in and damages were sustained within the Parish of St. John the Baptist. Denka and DuPont removed this action to this Court under the basis of minimal diversity jurisdiction under 28 U.S.C. § 1332(d). The 40th Judicial District Court lies geographically within this federal judicial district. Plaintiffs reserve their right to contest the existence of subject matter jurisdiction should subsequent discovery contradict the factual basis for Defendants' assertions of their citizenship in their response to Plaintiffs' motion to remand. Plaintiffs also reserve their right to appeal from the denial of their right to remand at the time any appeal ripens from any judgment in this matter.

## III.    PROPOSED CLASS DEFINITION

14.    **Class Definition.** Pursuant to La Code Civ. Proc. art. 591, the named Plaintiff herein proposes to proceed individually and as representative of a class of persons defined as follows:

> "(1) Those persons who, at any time from January 1, 2011 through the present, have lived, worked, attended school, and/or actually resided within a geographical boundary of St. John the Baptist Parish (hereinafter referred to as "St. John"), starting at the northwest corner of zip code 70084, then proceeding eastward along I-10 through zip code 70084 and the southside part of zip code 70068, to the northeast corner of the class boundary where Interstate-10 meets the St. John line within zip code 70068 of St. John, then proceeding southward within St. John along the St. John boundary line over the Mississippi River and through zip code 70057 in St. John to LA Hwy. 3127 within zip code 70049, then proceeding west/southwest along LA Highway 3127 within zip code 70049, to the southwest corner of the class boundary where LA Highway 3127 meets the St. John parish line within zip code 70049, then proceeding northward within St. John along the

St. John parish line, through zip codes 70049, 70090 70051, and 70084 to I-10 within zip code 70084 (hereinafter referred to as "defined areas"); and

(2) who experienced one or more of the following physical symptoms: headaches; sinus problems; dizziness; insomnia; trouble breathing, respiratory irritation, or other respiratory problems; chest pains; acute cardiac palpitations; acute gastrointestinal disorder; acute bronchitis; acute onset of asthma; exacerbation of pre-existing asthma; fatigue; nausea; skin rash; temporary hair loss; chronic coughing; chronic nasal discharge; chronic cardiovascular disorder; chronic throat irritation; chronic eye irritation; chronic thyroid disorder; anxiety; and depression, resulting from their exposure to chloroprene (chlorobutadiene, C4H5Cl) and/or chloroprene-containing substances (hereinafter collectively referred to as "chloroprene"), emitted, released, and/or leaked from the PWF (Paragraphs One and Two of the class definition are hereinafter collectively referred to as "class definition")."

## IV.    FACTUAL ALLEGATIONS

**15.**    Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. During all material times hereto, DuPont, Denka, and DPE are and were "manufacturers" (hereinafter collectively referred to as "Manufacturing Defendants"), in the business of manufacturing, distributing, using, handling. selling, supplying, and/or maintaining chloroprene and neoprene on the premises of the PWF.[9] In **1931**, DuPont invented polychloroprene (hereinafter referred to as "neoprene"),[10] a synthetic chemical and weather-resistant rubber. In **1969**, DuPont began manufacturing chloroprene and neoprene at the PWF in Laplace, with its remaining two (2) chloroprene and neoprene manufacturing facilities located in Montague, Michigan and Louisville, Kentucky. In **1996**, DuPont closed the Michigan site, and in **2008**, its Kentucky site closed due to both pressure from concerned workers and environmental groups about toxic chloroprene emissions from the plant, as well as the new toxic-air regulations requiring DuPont to greatly reduce its chloroprene emissions. Upon closing its

---

[9] Hereinafter the words "manufacturing, distributing, using, handling. selling, supplying, and/or maintaining" shall mean and be referred to interchangeably as "manufacturing, manufacture, and manufactured."
[10] A few years after inventing polychloroprene, it changed the product's name to "Neoprene," to be used as its generic trade-name

Kentucky site, DuPont consolidated all of its chloroprene and neoprene manufacturing at the PWF, which has now been the only chloroprene and neoprene manufacturing plant in the United States since 2010. When Denka purchased the neoprene manufacturing and production units, DuPont was the leading producer of neoprene in North America.

16.    Since its purchase of the neoprene units and manufacturing business, Denka has been operating its chloroprene unit of the PWF under a title V operating permit 3000-V5, issued September 9, 2014; the neoprene Unit operates under permit 2449-V8 issued June 15, 2015; and the HCL Recovery Unit operates under permit 206-V3, issued June 18, 2015.

17.    When Denka purchased DuPont's neoprene manufacturing and production business and units in 2015 (hereinafter "Denka/DuPont Sale"), one of Denka's parent companies, Denka Kagaku Kogyo Kabushiki Kaisha, had been manufacturing chloroprene rubber since 1962, and one of its subsidiaries, the Denka Chemical Company, had previously manufactured chloroprene at a Houston-area plant during the 1980's and was aware of the information, studies, and of findings contained in EPA's release of the 2011 National Air Toxic Assessment (hereinafter referred to as "NATA") results and the National Enforcement Investigation Center (hereinafter referred to as "NEIC") Report. Therefore, during all material times hereto, Denka knew or should have known of the human health hazards from exposure to chloroprene; the inherently dangerous characteristics of chloroprene; the toxic concentrations of chloroprene being emitted into the define areas; the pathways of human exposure to chloroprene; and the illnesses and/or medical conditions caused by human exposure to chloroprene. Yet, after the Denka/DuPont sale, Denka only furthered the harmful chloroprene emission practices and concealment of said human health hazards from exposure and concentrations of chloroprene.

18.     Since 1969 through present day, the Manufacturing Defendants have caused and/or permitted, aided, furthered, and/or allowed the toxic emissions of chloroprene and/or other hazardous pollutants, such as 1,3-butadiene, polychloroprene, chlorine, hydrochloric acid, toluene, and ammonia (hereinafter collectively referred to as "HAPs"), into the air, soil, water, persons, and property of the Plaintiff and Putative Class members (hereinafter collectively referred to as "toxic emissions"). Due to said toxic emissions released by the Manufacturing Defendants, the Plaintiff and Putative Class members (hereinafter collectively referred to as "Plaintiffs"), have been exposed to toxic concentrations and/or biological doses of chloroprene and other HAPs, via inhalation, ingestion, direct skin contact, and direct eye contact, which has caused them to manifest the physical symptoms, illnesses, and/or medical conditions listed in the class definition.

### Health Hazards from Exposure to Chloroprene

19.     Neoprene is produced by chlorinating butadiene to yield a chloroprene monomer, which is polymerized to polychloroprene by emulsion polymerization. Chloroprene is manufactured from butadiene via a two-step process consisting of chlorination and subsequent dehydrochlorination. Chloroprene can also be manufactured by dimerizing acetylene and then hydrochlorinating the dimer to produce chloroprene. Manufacturers then convert chloroprene into polychloroprene polymer via emulsion polymerization. A solution of chloroprene and other ingredients is mixed with an aqueous caustic solution to produce an emulsion. By-products of chloroprene include toxic, corrosive, and flammable materials, such as: butadiene, chlorine, sodium hydroxide, pentane solvent, chloroprene monomer, chlorinated butadiene intermediates and byproducts; hydrochloric acid byproduct; and sodium chloride.

20.     Chloroprene is a flammable liquid with a pungent odor. It is used primarily in the manufacture of neoprene and/or polychloroprene elastomers. When released to air, chloroprene

has an 18-hour half-life when reacted with photochemically-generated hydroxyl radicals and a 10 day half-life when reacted with the ozone;[11] when released to water, its half-life is 3 hours from streams and 4 days from lakes;[12] and, if released to soil, chloroprene will not adsorb to sediment or suspended solids or bioaccumulate in aquatic organisms.[13]

21.     According to the Occupational Safety and Health Administration (hereinafter referred to as "OSHA"), chloroprene emits highly toxic fumes of chlorine gas into the air; causes eye, skin, and respiratory system irritation; may be fatal if inhaled, ingested or absorbed through skin; inhalation or contact with chloroprene may burn skin and eyes; and chloroprene vapors may cause dizziness or suffocation. Further, OSHA recommends that for very large or small chloroprene spills, there must first be isolation in all directions, then protection of persons downwind during day through night; and if inhaled, "immediately leave contaminated area; if symptoms (such as wheezing, coughing, shortness of breath, or burning in mouth, throat, or chest) develop, call a physician and be prepared to transport the victim to the hospital."

### Defendants' Knowledge of the Human Health Hazards
### from Exposure to Chloroprene

22.     During all material times hereto, the Defendants, Denka, DuPont, DPE, DEQ, DHH, Lavastida, Walsh, Grego, Pigeon, Glenn, and Caldwell (hereinafter collectively referred to as "Defendants"), knew or should have known of the EPA reports since 1985 listing the possible health effects associated with chloroprene exposure;[14] that in 1999, the International Agency for

---

[11] HSDB. 2009. <u>Hazardous Substances Data Bank</u>. National Library of Medicine. http://toxnet.nlm.nih.gov/cgi-bin/sis/htmlgen?HSDB and search on CAS number. Last accessed: 5/09.

[12] *Id*.

[13] *Id*.

[14] Those reports include but aren't limited to a following summary of health effects issued by the EPA: <u>Acute (short-term)</u>: giddiness, headache, irritability, dizziness, insomnia, fatigue, respiratory irritation, cardiac palpitations, chest pains, nausea, gastrointestinal disorders, dermatitis, temporary hair loss, conjunctivitis, and corneal necrosis; liver, kidneys, and lungs damage; circulatory system and immune system disorders; depressed central nervous system (CNS); irritation of the skin and mucous membranes; dermatitis; and respiratory difficulties; and <u>Chronic (long-term)</u>: respiratory, eye and skin irritation; chest pains; temporary hair loss; neurological symptoms (e.g., dizziness, insomnia,

Research on Cancer (hereinafter referred to as "IARC") classified chloroprene as "possibly carcinogenic to humans;" in 2005, the National Toxicology Program's Report on Carcinogens classified chloroprene as "reasonably anticipated to be a human carcinogen;" of material safety data sheets (hereinafter collectively referred to as "MSDS") authored and published by DuPont and others, which detail the hazardous risks of human exposure to chloroprene via various pathways, such as: lung damage and irritation of the mouth, throat and stomach (inhalation), eye irritation, reddening and tearing (direct eye contact), and nausea and vomiting (ingestion); and that the EPA has deemed chloroprene as a "likely carcinogen."

23.    Epidemiology studies show the health effects of human exposure to chloroprene, such as: nervous system depression, injury to the lungs, liver and kidney, irritation of the skin and mucous membrane, and respiratory difficulties; temporary hair loss; fatigue; pressure or pains over the chest; palpitations, giddiness, irritability, and dermatitis; gastrointestinal disorders, conjunctivitis and corneal necrosis;[15] changes in the nervous system, hepatic and renal function, cardiovascular system, and hematology;[16] abnormal diurnal variation in arterial pressure, with reduced systolic and diastolic components; high pulse rates; and lengthening of sensorimotor response to visual cues compared with controls; central nervous system (CNS) disfunction;[17] dermal resulting in

---

headache); fatigue; effects to the cardiovascular system (rapid heartbeat, reduced blood pressure) and changes in blood cell parameters (red blood cells, hemoglobin content, white blood cells, and platelets).

[15] Nyström, Å.E. (1948, 003695), Health hazards in the chloroprene rubber industry and their prevention. A clinical and experimental study with special reference to chloroprene as well as oxidation and polymerization products thereof. Acta med. scand., 132 (Suppl. 219), 1–125 (1948); Schwartz, 1945; Barskii, V.D., Marakushkina, V.K. & Meshakova, N.M. (1972) Hygienic evaluation of the working conditions and health of workers employed in the production of chloroprene rubber in eastern Siberia. Nauch Tr. Irkutsk. med. Inst., 115, 5–8 (in Russian) (1972); Lloyd, J.W., Decoufle, P. & Moore, R.M., Jr., Background information on chloroprene. J. occup. Med., 17, 263–265 (1975); Bascom, R., Fisher, J.F., Thomas, R.J., Yang, W.N., Baser, M.E. & Baker, J.H. Eosinophilia, respiratory symptoms and pulmonary infiltrates in rubber workers. Chest, 93, 154–158 (1988) (respiratory illness).

[16] Sanotskii IV (063885; 063885), Aspects of the toxicology of chloroprene: immediate and long-term effects. Environ Health Perspect, 17: 85-93 (1976).

[17] Id.; Khachatryan, E.A., The occurrence of lung cancer among people working with chloroprene. Vop. Onkol., 18, 85–86 (1972a). Khachatryan, E.A., The role of chloroprene compounds in the process of skin neoplasm formation. Gig. Tr. prof. Zabol., 16, 54–55 (1972b); Khachatryan, M.R. & Oganesyan, G.L., Changes in the nervous and cardiovascular system of shoe industry workers having contact with Nairit cements in the Masis Company. Zh.

dermatitis and hair loss;[18] hepatomegaly, with a decrease in liver function, toxic hepatitis, dystrophy of the myocardium and changes in the nervous system;[19] change human genetic material, increasing the risk of mutations in human DNA;[20] and cancers of the liver, lung,[21] and digestive and lymphohematopoietic systems;[22] and leukemia.[23]

24.    In **1938,** Dr. John Foulger, M.D. (hereinafter "Foulger"), head of DuPont's Haskell Laboratory, issued a report called "Toxicity of Chlorobutadiene." The report, which DuPont submitted to the EPA in **1992**, more than **50 years** after it was written, detailed:

a.  Complaints of dizziness, headaches, nausea, heart palpitations, diarrhea, and rapid pulse, being made by workers exposed to chloroprene at its work site; results from studies showing manifestations of the same physical conditions listed under the subject class definition hereinabove, such as: **"headache, ease of fatigue, gastric disturbance (nausea, loss of appetite, frequent belching, distention of the stomach, pain in the epigastrium), dizziness, respiratory distress on exertion, pain around the heart, palpitation, and tingling or pain in the arms.";**

b.  Primary signs of exposure to chloroprene by workers at DuPont's neoprene plants were circulatory abnormalities (low or rapid pulse, moderately elevated or low blood pressure and pulse pressure); and

c.  Observational findings suggestive of chlorobutadiene or nonvinyl acetylene, or both, behaving in low atmospheric concentrations in the same manner as do many other volatile compounds.

25.    In **1974,** John Zapp, DuPont's then Haskell Laboratory director, sent a letter to the director of the National Institute of Occupational Safety and Health, expressing concern over the potential carcinogenicity and other health hazards of chloroprene**.** During that time, DuPont was also aware

---

eksp.klin. Med., 14, 85–89 (1974).

[18] Schwartz, Skin hazards in the manufacture and processing of synthetic rubber. J. Am. med. Assoc., 127, 389–391 (1945); Nyström, Å.E., Health hazards in the chloroprene rubber industry and their prevention. A clinical and experimental study with special reference to chloroprene as well as oxidation and polymerization products thereof. Acta med. scand., 132 (Suppl. 219), 1–125 (1948);

[19] Orlova, A.A. & Solov'ena, E.A., Clinical picture of chronic exposure to various chemicals used in synthetic rubber. Tr. Voronezhsk. med. Inst., 47, 86–87 (1962);

[20] Munter T1, Cottrell L, Ghai R, Golding BT, Watson WP, Chem Biol Interact. 166(1-3):323-31. Epub (2006).

[21] Colonna M, Laydevant G. 2001. A cohort study of workers exposed to chloroprene in the department of Isere, France. Chem Biol Interact 135-136: 505-514.

[22] Pell S. 1978. Mortality of workers exposed to chloroprene. J Occup Med 20(1): 21-29.

[23] Bulbulyan MA, Changuina OV, Zaridze DG, Astashevsky SV, Colin D, Boffetta P. 1998. Cancer mortality among Moscow shoe workers exposed to chloroprene (Russia). Cancer Causes Control 9(4): 381-387.

of many other articles and reports from the United States and other countries suggesting the dangers of human exposure to chloroprene. In **1988**, DuPont created a document for submission to its AEL Committee, entitled "Acceptable Exposure Limits," which set exposure limits for a certain list of chemicals including chloroprene; listing chloroprene as a substance considered as a "**carcinogenic, development, reproductive, or germ-cell mutagenic hazard**;" and stating that the limits provided in this list are "based upon the best available information from industrial experience, animal toxicity studies, controlled **human exposure studies,** and **epidemiological findings**."

26.    From **September 3-11, 2015, and October 26-28, 2015**, DHH investigated a report of asthma-like respiratory symptoms at the East St. John Elementary (ESJE) School located at 1880 Hwy 44 in Reserve, Louisiana. The school reported asthma-like respiratory symptoms in 20-24 children each day on two occasions: September 3-11, 2015 and October 26-28, 2015. Children complained to the school nurse of stomach ache, headache, sore throat, chest tightness, vomiting, burning eyes/nose, dizziness, fever, nausea, and weakness. The DHH investigation included a site visit on September 14, 2015, and consultations with the school nurse, the principal, and regional medical director. The East St. John School Board also hired consultants to test for indoor air quality. On **November 13, 2015**, DHH published a report,[24]finding that East. St. John Baptist Parish Elementary School (Leon Godchaux Site) is located in "a high-risk area" for exposure to air-borne particulates and the risk of chemical releases; and that the school should be moved from the area as early as possible.

27.    During **June 2015**, Adrienne Katner, MS DEnv, of the St. John the Baptist Parish Heath District, published an article with her findings from investigations of geographic distributions of

---

[24] DHH's report is entitled "Summary of Existing Environmental Public Health Data East St. John the Baptist Parish Elementary School (Leon Godchaux Site)."

carcinogen releases by Louisiana industries using EPA's Toxics Release Inventory data on estimated releases between 1996 and 2011.[25] Therein, chemicals associated with cancers of the prostate, lung, bladder, kidney, breast and non-Hodgkin lymphoma were identified; and chloroprene was identified as one of "high carcinogen contributors" to said cancers. She also found that St. John the Baptist Parish ranks amongst the highest contributors to cancer-specific model scores.

28.    From **March 1 through March 10, 2016**, the EPA and DEQ deployed VOC sampling canisters to collect ambient air samples in the LaPlace community. Laboratory data of air samples taken from Lady of Grace School, Fifth Ward Elementary School, East St. John's High School, Ochsner River Parish Hospital, and on the nearby levee showed that chloroprene was detected in ambient air samples in the neighborhood sampling locations. Additionally, DEQ collected grab air samples and analyzed them on their Mobile Air Monitoring Laboratory (hereinafter referred to as "MAML"). Like the ambient air monitoring done with the canisters, the DEQ air grab samples analyzed in the field using MAML detected chloroprene in the neighborhoods surrounding the PWF.

29.    In **2010**, the EPA published its peer-reviewed toxicological assessment of chloroprene, concluding that it is "likely to be carcinogenic to humans" through a mutagenic mode of action and that the primary exposure route of concern is inhalation. Thus, DuPont, DEQ, DHH, and Denka's affiliates all knew or should have known much earlier than 2015 that the EPA had concluded that chloroprene could cause cancer. Yet, DuPont and Denka PWF continued to pump over 100 tons of chloroprene into the air on an annual basis, exposing its neighbors to the

---

[25] Katner, Adrienne, Prioritization of Louisiana Parishes based on Industrial Releases of Known or Suspected Carcinogens, The Journal of the Louisiana State Medical Society: Louisiana State Medical Society 167(3):122-128 · May 2015.

carcinogenic emissions. In **December 2015**, after the EPA released the results of the 2011 National Air Toxics Assessment (hereinafter referred to as "NATA") of chloroprene (and other toxins), it became harder for the Defendants to ignore or attempt to deny the hazardous nature of chloroprene. The 2011 NATA, which estimated concentrations of airborne toxins and population exposure and calculated the associated risks of cancer and other serious health problems, concluded that there are dangerous levels of airborne chloroprene in certain census tracts around the PWF. Even worse, the study calculated that individuals living in those census tracts, such as the Plaintiffs herein, have the highest risk of cancer in the entire United States of America, due to their exposure to chloroprene. The 2011 NATA results released in 2015 showed that in the census tracts around the PWF, the risk was as high as 768-in-1 million – 800 times the national average – for developing cancer from exposure to chloroprene; and the 2014 NATA's updated calculations show that there is a 1279-in-1 million risk of cancer from exposure to chloroprene – 25% higher than the state average.

**30.**    Based on the 2011 NATA, the EPA established in 2015 that an acceptable risk exposure threshold for concentrations of chloroprene in the ambient air is .2 µg/m3. On information and belief, the amount of chloroprene emitted from the PWF under DuPont's ownership and operation has historically resulted in chloroprene air concentration in the defined areas that have far exceeded that threshold; and have continually exceeded the threshold under Denka's ownership of the neoprene units. Air sampling within the defined areas since 2016 by the EPA and Denka have revealed excessive chloroprene concentrations in 2016, 2017, and 2018; and based on Denka's own air modeling of concentrations going back to 2011, concentrations have remained higher than what Denka itself recommended as an acceptable level.

## DEQ Permitting Responsibilities

**31.**    The neoprene-producing units at the PWF, under both DuPont and Denka, have operated and continue to operate pursuant to permits issued by the DEQ that limit the amounts of hazardous chemicals that may be discharged into the air and water and are intended to control such emissions. The permits address all aspects of emissions into the air and water, including the installation, operation, and maintenance of emission-control measures and equipment; emission-monitoring requirements; and leak-monitoring requirements and systems.

**32.**    DEQ's stated purpose in regulating emissions through these permits is to protect the health, safety, and welfare of the public. On every permit issued for one of the neoprene-producing plants, an individual must be designated as the PRO. Under Louisiana law, the PRO must be a corporate officer or another duly authorized individual with similar policy or decision-making functions for the corporation, who is responsible for the overall operation of the manufacturing, production, or operating facility that is applying for the permit. On information and belief, the PRO is personally responsible for ensuring that the facility complies with the permits issued by DEQ. For all permits relating to emissions of chloroprene and the other hazardous chemicals released into the air and water, going back to at least 1993, the respective plant manager of the PWF was the designated PRO.

### Denka's Non-Compliance with DEQ Permits &
### National Enforcement Investigation Center's 2016 Inspection

**33.**    In June 2016, after the 2011 NATA results had been made public, the EPA's National Enforcement Investigation Center (hereinafter referred to as "NEIC") conducted a compliance inspection at the PWF. A redacted version of the report from the inspection was first made publicly available by the EPA on April 3, 2017. The NEIC Report reveals multiple areas of apparent noncompliance of the Manufacturing Defendants with not only the permits issued to the facility,

but also with applicable state regulations, since 1997 or earlier,[26] which have substantially contributed to cause of the harmful emissions of chloroprene into the defined areas; the Plaintiffs' exposure to harmful doses of chloroprene; the Plaintiffs' injuries and/or damages; and significant underestimations and/or understatements of the actual amounts of chloroprene and other HAPs that have been released into the defined areas by the Manufacturing Defendants, from the PWF.

### Denka's Concealment of the Chloroprene Hazards

34.    After the NEIC Report was made publicly available, Denka did not take immediate steps to reduce emissions or to warn or provide information to the neighboring community about the dangers of the toxic emissions from the PWF. Instead, Denka sought to conceal the dangers and serious health risks from the community. In addition to continuing its attempts to have the EPA both reclassify chloroprene as well as increase the acceptable threshold for ambient air concentration of chloroprene, Denka affirmatively and misleadingly reassured the community that there was nothing to fear. Even though Denka agreed to enter into an Administrative Order on Consent (hereinafter referred to as "AOC") with DEQ on January 6, 2017, whereby it would take certain steps and implement changes in an attempt to reduce chloroprene emissions by a total of 85% (which would still result in emission levels above the EPA's .2 µg/m3 threshold), Denka refused to acknowledge to the public or its neighbors that the facility emitted unsafe levels of chloroprene. To the contrary, Denka states on its website that it believes many of the community concerns about health risks associated with emissions from its facilities are unfounded; that the science on which the EPA has relied needs to be updated and corrected; that epidemiology studies

---

[26] The areas of non-compliance include but aren't limited to: Failing to properly monitor emissions from the chloroprene vent condenser to ensure that it continuously operated effectively; Failing to calculate emission rates at the proper exit points of certain emission sources; Failing to monitor certain emission points altogether; Failing to institute appropriate controls at some chloroprene emission sources; Failing to identify and properly classify certain emissions sources; Failing to timely repair sources of leaks; and Failing to perform wastewater sampling.

and public-health data do not show a basis for public concerns; and that St. John the Baptist Parish has one of the lower cancer rates in the state. It further suggests on its website that the NATA calculations as to increased risk of cancer from chloroprene in the census tracts around the plant are unreliable.

35.     In May 2018, Denka went so far as to send copies of a letter to homes in the neighborhoods around the PWF, as a mere effort to start the "statute of limitations" or "prescriptive period" by later being able to argue that the letter amounted to "knowledge" and/or the tolling of the Plaintiffs' prescriptive period. However, said letter resulted in the contrary, as the language therein concealed and/or mislead the public and the Plaintiffs who received said letter, regarding the hazards, concentrations, and fault of the emission of chloroprene from the PWF. The letter, signed by Defendant Jorge Lavastida as "Executive Officer and Plant Manager" and the President and CEO of the company, purports to inform its neighbors that there is "a lot of misinformation" about the facility; that the 2011 NATA report was based on incomplete and inaccurate information and assumptions; that there is no evidence of the risks the 2011 NATA report describes; and that reliable science and studies "clearly show there is no increased incidence of these cancers in St. John Parish." It goes on to note that "Louisiana's leading health official has stated there is no risk from our facility." Mr. Lavastida's nineteen (19)-page letter further states that:

   a. The EPA's public assessment had "***created unnecessary public alarm***" in LaPlace, Louisiana;"
   b. The local citizens group are to blame for "handing out misleading flyers and protest near its facility;"
   c. St. John the Baptist Parish has turned the Denka air emissions into an environmental cause "célèbre," a term commonly suggestive of something being used to arouse incident controversy or attract public attention;
   d. Leading epidemiological study of chloroprene showed no linkage between worker exposure to chloroprene and the incidence of cancer;
   e. The IRIS report provides "conclusions and advice to the public that do not reflect the best available science" or "sound and objective scientific practices;"

f.   Noncancer inhalation exposure risks were derived from methodological errors and should be withdrawn;

g.   Citizen activists picket the facility and local schools wearing red t-shirts emblazoned with "Only 0.2 will do;"

h.   Denka has suffered severe "***reputational*** damages;"

i.   The "cost of these emission reduction devices is approximately $18 million, and the devices will cost hundreds of thousands of dollars per year to operate"; and

j.   "Environmental activists and plaintiffs' lawyers have had numerous meetings in the community about DPE, all based on the faulty assumption that 0.2 µg/m3 is the "safe" level for chloroprene."

### DHH's Acts of Concealment of the Chloroprene Hazards

**36.**    The reference in Denka's letter to "Louisiana's leading health official" is to DHH's Medical Director and the State Health Officer of Louisiana, Jimmy Guidry, who has repeatedly stated that individuals living around the PWF do not face serious health risks from living near the plant. These statements were made not only after the EPA's release of the 2011 NATA results and the NEIC Report, but also after the DHH had received complaints in 2015 regarding students at a school that had been temporarily relocated approximately one mile from the PWF. The students complained of various symptoms consistent with exposure to chloroprene, but DHH did not adequately or fully investigate the cause of the symptoms or warn the public of the harmful effects of chloroprene, instead labeling the causes as undetermined. DHH did note that the temporary school "is located in a high-risk area situated among several industrial facilities that produce air-home particulates and the risk of chemical releases," and that "[t]he school should be moved back to its permanent location at the earliest possible time."

**37.**    On information and belief, DHH knew or should have known of the dangers of chloroprene and the other HAPs emitted by the PWF long before the 2011 NATA results and the 2016 NEIC Report, as industry information about the health risks associated with exposure to chloroprene was readily available to the DHH, and well-respected groups, such as the International Agency for Research on Cancer and the National Toxicology Program, had already classified the chemical as

likely being carcinogenic years before. The DHH knew or should have known of the dangers associated with the toxic emissions from the PWF based on the MSDS alone, yet the DHH did nothing to warn the community around the plant of any health risks.

### DEQ's Acts of Concealment of the Chloroprene Hazards

38.    The DEQ, like the DHH, supported Denka in its public-relations campaign to convince the citizens living around the Denka plant that they did not face increased risks of cancer or other serious health effects from exposure to chloroprene and the other toxins emitted from the plant. The DEQ had known for decades about the large amounts of chloroprene and other hazardous chemicals being released from the facility, as DuPont (and later Denka) filed air-emissions inventories and reports with the DEQ every year. Furthermore, DEQ had inspected the facilities multiple times. Yet the DEQ did not warn or take other steps to protect the public, either before or even immediately after the EPA released information regarding the dangers of chloroprene and the increased risks of cancer faced by those living around the plant.

39.    The DEQ has continued to do nothing to warn or protect the public even after the 2011 NATA results and the 2016 NEIC Report were publicly available, and, instead, supported Denka in its efforts to downplay the risks posed to the community and hide the dangers of the emissions coming from the plant. Like Mr. Guidry and the DHH, DEQ Secretary Chuck Brown publicly dismissed any concerns about health risks from chloroprene concentrations after the EPA's data on chloroprene and the Denka plant was made publicly available. Mr. Brown stated at a meeting of the St. John the Baptist Parish School Board on or around December 8, 2016, that those expressing fears or concerns for the community were "fear mongers," and that everyone should "forget about 0.2."

**Plant Manager Defendants' Tortious Acts and Omissions**

**40.**     Lavastida, Walsh, Grego, Pigeon, Glenn, and Caldwell (hereinafter collectively referred to as "Plant Manager Defendants") were each designated to the DEQ as PROs for the permits under which the PWF operated and emitted chloroprene and other toxins into the air and water, going back to 2003. As a result, the Plant Manager Defendants were personally responsible for ensuring DuPont's and/or Denka's compliance with these permits. By state regulation, that personal responsibility could not be delegated further to other individuals working at the plant.

**41.**     Not only were each of the Plant Manager Defendants responsible for ensuring that the facility complied with the DEQ permits, but they were also the individuals directly and personally responsible for overall plant operations and emissions controls. DuPont and/or Denka delegated to the Plant Manager Defendants the duty to ensure that the operations of the facility did not endanger the neighboring community through unsafe operations or dangerous levels of emissions. Based on the MSDS sheets at the facility, each of the Plant Manager Defendants had actual knowledge of the adverse health risks posed by chloroprene and the other chemicals that the plant was releasing.

**42.**     On information and belief, the Plant Manager Defendants had knowledge of the potentially carcinogenic and non-carcinogenic human health hazards of chloroprene much earlier than the 2015 release of the 2011 NATA results, as not only had DuPont been studying the chemical for decades and was well aware of reports of its toxicity to humans, but also respected organizations had already classified the chemical as reasonably anticipated to be carcinogenic to humans even before the EPA reported in 2010 that it was "likely to be carcinogenic to humans." Defendant Lavastida unquestionably knew that the EPA had concluded that chloroprene was a likely carcinogen and that the plant's emissions of chloroprene greatly exceeded levels that would be necessary to meet the EPA's recommended threshold for ambient air concentration, as he was the

plant manager at the time the 2011 NATA results were made public and during the 2016 NEIC inspection. On information and belief, each of the Plant Manager Defendants under both DuPont and Denka had the authority to shut down the plant and implement changes to emissions controls and systems necessary to reduce dangerous emissions, but none exercised his authority to take steps to protect the community surrounding the facility by reducing emission levels or shutting the plant down until emission levels could be lowered to safe levels.

43.    As a result of the above-described acts and omissions by all of the Plant Manager Defendants, the Plaintiffs have sustained serious physical injuries and have each been permanently and irreparably harmed by exposure to the unsafe levels of chloroprene and other chemicals in the air and water around the PWF. The Plaintiffs members have continued to sustain and suffer with one or more of the physical conditions, injuries, and/or conditions listed in proposed class definition and will likely continue to sustain and suffer the same, along with severe emotional distress, mental anguish, loss of enjoyment of life, and fear of developing future cancers and other serious medical conditions, as well as death. The continuous tortious emissions of unsafe levels of chloroprene and other hazardous chemicals from the PWF's neoprene-producing units by the Manufacturing Defendants have resulted in continuous and successive damages to the Plaintiffs.

44.    The continuous, daily exposure to unsafe levels of chloroprene and other hazardous toxins in the ambient air by Denka and DuPont continues to harm the Plaintiffs, as each day of exposure results in an increased likelihood of developing new and exacerbated physical injuries, conditions, and/or illnesses such as those listed in the proposed class definition, including but not limited to cancers and other serious and adverse medical conditions. Until Denka's emissions are reduced to safe levels, the Plaintiffs will continue to sustain successive damages.

45.    The public statements and positions of the Defendants were attempts to conceal the Defendants' tortious conduct and to prevent the public, including the Plaintiffs, from learning of the dangerous health risks posed by the PWF. Such statements were also intended to conceal the fact that the diseases and medical conditions suffered by the Plaintiffs were caused by exposure to unsafe levels of chloroprene and other hazardous toxins emitted by the facility and the fault of the Defendants and to impede the Plaintiffs' ability to assert each of their causes of actions stated herein. The Defendants' conduct, statements, and actions did, in fact, delay the Plaintiffs' discovery and knowledge that their physical and mental injuries, conditions, symptoms, manifestations, and/or illnesses, such as those listed in the class definition, had been caused by exposure to the toxic emissions from the PWF.

46.    Although some Plaintiffs and some of Putative Class members were diagnosed more than one (1) year prior to the filing of the original Class Action Petition, First Amending Class Action Petition, and/or this Second Amending Class Action Petition (hereinafter collectively referred to as "Petitions"), none of the Plaintiffs, knew or reasonably should have known that any of their physical and mental injuries, conditions, symptoms, manifestations, illnesses, claims, or causes of action referenced herein, were caused by their exposure to chloroprene or any of the Defendants' tortious toxic emissions and/or conduct from or at the PWF, before one (1) year prior to the filing date of their original Class Action Petition or this Second Amending Class Action Petition.

## V.    CAUSES OF ACTION

### Count 1- Negligence and/or Gross Negligence of the Manufacturer Defendants

47.    Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. For the following reasons, the Plaintiffs allege that the Manufacturing Defendants are each at fault and/or comparatively at-fault for allowing,

furthering, aiding, and/or permitting the continuing emissions of toxic concentrations and/or doses onto/into the air, water, soil, person, and property of each of the Plaintiffs. During all material times hereto, each of the Manufacturing Defendants owed respective duties to the Plaintiffs to operate, control, handle, and manage their activities at the PWF and/or its neoprene units in such a manner as to prevent the Plaintiffs' harmful exposure to chloroprene and other HAPs being emitted from the PWF. During all material times hereto, each of the Manufacturing Defendants breached their respective duties by committing the following, non-exclusive, negligent, grossly negligent, and intentional acts and omissions:

a. Causing, allowing, furthering, aiding, and/or permitting the continuing release of toxic chloroprene and HAPs onto/into the air, water, soil, person, and property of Plaintiffs;

b. Causing, allowing, furthering, aiding, and/or permitting the continual exposure of the Plaintiffs' person and property to toxic and/or hazardous does of chloroprene and HAPs being emitted from the PWF, during each of the manufacturer Defendants' respective operations, manufacture, construction, production, handling, storage, and/or sell of chloroprene and/or neoprene at, within, or near the PWF;

c. Failing to take timely, adequate, reasonable and sufficient steps to prevent the release of toxic chloroprene and HAPs onto/into the air, water, soil, person, and property of Plaintiffs;

d. Failing to timely, properly, and/or adequately prevent, avoid, handle, contain, reduce, abate, and/or mitigate the hazardous emissions of chloroprene and HAPs from the PWF;

e. Failing to comply with DEQ operational and/or work permits issued to the PWF in relation to the manufacture of chloroprene and/or neoprene;

f. Failing to timely, properly, and adequately inspect their equipment and PWF plant facilities and equipment used in the manufacture of chloroprene and/or neoprene to assure that said equipment and facility were fit for their intended purpose and/or use;

g. Acting in a careless manner and with utter disregard for human safety, health, and life of others, specifically the Plaintiffs, by: (1) failing to take timely, adequate, reasonable and sufficient steps to prevent, avoid, handle, contain, reduce, abate, and/or mitigate the release of toxic chloroprene and HAPs onto/into the air, water, soil, person, and property of Plaintiffs, after possession knowledge and information of the human hazards to exposure to chloroprene at the concentrations and/or dose that the Plaintiffs are being exposed to, during all material times hereto; and (2) failing to disclose said information and/or provide warnings to the Plaintiffs and/or local and state agencies;

h. Failing to timely, properly, and adequately monitor emissions from the chloroprene vent condenser to ensure that it was continuously operating effectively;

i. Failing to timely, properly, and adequately calculate emission rates at the proper exit points of certain emission sources;

j. Failing to timely, properly, and adequately: monitor certain emission points; classify certain emissions sources; repair sources of leaks of chloroprene and HAPs from the PWF

to the defined areas; perform wastewater sampling; use equipment sensitive enough to identify all leaks; conduct performance testing and reasonably monitor certain emission sources; replace leaking valves within required time limits; include appropriate emissions factors in air permit application materials; institute appropriate emissions controls for the chloroprene Group I storage tank, the surge control vessels, and the combustion chambers; and/or maintain required destruction efficiency and minimum atomization flow rates;

k.  Failing to timely, properly, and adequately train, monitor, hire, retain, and supervise its employees in safety inspection, monitoring, manufacturing, production, storing, and/or handling of chloroprene and/or other HAPs;

l.  Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of chloroprene and the HAPs;

m.  Failure to timely warn the Plaintiffs of the human hazards, risks of harm and/or medical conditions and illness from human exposure to chloroprene and the emissions and concentrations of chloroprene in the defined areas;

n.  Misleading the Plaintiffs and the community as to the serious health risks and dangers form exposure to chloroprene and other HAPs being emitted from the PWF;

o.  Failing to self-report violations under the Environmental Quality Act under La. R.S. 30:2001 et seq. (hereinafter referred to as "EQA");

p.  Failing to report violations under the "Air Control Law" under La. R.S. 30:20030 §2051– 2066 after said discharge(s) and/or emission(s) and/or release(s) exceeded the allowable limits;

q.  Failing to provide proper and adequate notice pursuant to the "Hazardous Waste Control Law (La. R.S. 30:2189), after obtaining information indicating chloroprene and HAPs were being released and/or emitted into the air, water, soil, person, and/or property of Plaintiffs and defined areas;

r.  Failing to provide timely, proper, and adequate notice and reports of said emissions of chloroprene and HAPs in accordance with La. R.S. 30 §2361–2380;

s.  Failing to timely, properly, and adequately provide and/or disclose information, studies, and data to the EPA, DEQ, DHH, and other pertinent agencies of: the harmful effects of human exposure to chloroprene, the excessive concentrations being emitted from the PWF, and the complaints made by workers due to exposure to chloroprene and HAPs being emitted at or from the PWF;

t.  Failure to timely cease and/or abate the excessive and harmful emissions of chloroprene from the PWF into the defined areas and the Plaintiffs' persons and property; and

u.  Such other acts of negligence as will be shown at the trial of this matter.

**48.**    The Manufacturing Defendants' acts and omissions listed immediately above proximately

caused and/or were substantial factors in: bringing about the continual emissions of harmful

concentrations and/or doses of chloroprene and HAPs from the PWF into the defined areas; the

Plaintiffs exposure to hazardous doses of chloroprene and HAPs; and actual and continual,

successive damages suffered by the Plaintiffs. The Manufacturing Defendants continue on a daily

basis to emit chloroprene in amounts that continue to create an unreasonable and foreseeable risk of harm to Plaintiffs.

49.     Furthermore, the Manufacturing Defendants' forgoing negligent, grossly negligent, and intentional acts and omissions proximately caused and/or were substantial factors in bringing about actual, continual and successive damages suffered by the Plaintiff and Putative Class Members in forms including but not limited to: personal and/or physical injury, emotional distress, loss of income, fear of cancer and other health conditions, and conditions that are harmful to human health and the environment. But for each of the Manufacturing Defendants' forgoing acts and omissions, the Plaintiff and Putative Class members would not have been exposed to harmful/toxic concentrations and/or doses of chloroprene and other HAPs being emitted from the PWF sufficient to manifest the medical injuries, conditions, and/or damages actually suffered by them.

50.     Further, during all material times hereto, the unreasonable risks of harm, damages, and injuries that befell upon the Plaintiffs were reasonably foreseeable to each of the Manufacturing Defendants, given that prior to, during, and after each of their respective manufacturing and production of chloroprene and neoprene at the PWF, they each possessed information, documentation, studies, and/or reports showing and/or establishing: the hazardous human health effects from exposure to chloroprene at the types and amounts of concentrations and/or biological doses of chloroprene that the Plaintiffs have been exposed to; the excessive concentrations of chloroprene emitting into the defined areas; the pathways that humans are exposed to chloroprene (e.g. inhalation, dermal, oral, etc.); complaints of medical conditions and/or illness from individuals living, working, and/or attending school within the defined areas; and other pertinent information.

51.    At all relevant times, Manufacturing Defendants should have taken reasonable steps to prevent the unreasonable risks of harm, damages, and injuries that befell upon the Plaintiffs. However, they have failed to and continue to fail to do so, causing the Plaintiffs to sustain continual and successive actual damages. Further, all of the forgoing acts and omissions are and/or were in contravention of the laws of the State of Louisiana and the ordinances of the Parish of St. John the Baptist, which, during material timers hereto, were created to protect the Plaintiffs from the aforementioned unreasonable risks of harm that befell upon the Plaintiffs

## Count 2 – Strict Liability Pursuant to La. Civ. Code Arts. 2317-2317.1

52.    Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. As mentioned hereinabove, during all material times hereto, each of the Manufacturing Defendants, during separate periods of time, have had ownership, care, custody, and control of the neoprene units of the PWF; and DuPont has maintained care, custody, and control of the PWF since 1969. While under each of the Manufacturing Defendants' ownership, custody, care, and control, the neoprene units and the PWF contained defects, ruin, and/or vices existed in, within, or on the premises of the PWF and neoprene units, including but not limited to:

a. Faulty and/or inadequate equipment sensitive enough to identify all leaks of chloroprene and/or HAPs; damaged, ruined, inadequate, non-compliant, faulty, and/or leaking gas/vapor valves within the neoprene units of the PWF;
b. Un-capped and/or open-ended chloroprene and HAPs gas lines and piping, lacking caps, blind flanges, plugs, or second valves placed on the ends of the lines, which NEIC inspectors identified as causing at least 31 valve leaks or releases of chloroprene and/or HAPs into the ambient air of the defined areas;
c. Faulty, ruined, and/or defective "group-1 batch, front-end process vent;"
d. Faulty, ruined, and/or defective "poly kettle;"
e. Faulty, defective, and/or inadequate controls within a Group 1 storage tank and other storage vessels situated in or on the neoprene units of the PWF, for controlling, measuring, and/or reading vapor pressure and/or the release of chloroprene and HAPs therefrom; and
f. Faulty, defective, inadequate non-compliant, faulty, and/or leaking combustion system in the neoprene units of the PWF.

53.     During all material times hereto, the defects, ruin, and/or vices listed immediately above (hereinafter collectively referred to as "defects") in or on the premises of the PWF and its neoprene units amounted to a dangerous condition upon said premises and created an unreasonable risk of harm to the Plaintiffs, given that it was highly likely that by using the neoprene units while it contained the aforementioned defects, excessive and dangerous amounts of chloroprene would leak, release, and/or emit into the defined areas and the Plaintiffs persons, causing the types of injuries and/or harm suffered by the Plaintiffs. Plaintiffs aver that compared to the harm caused to the Plaintiffs, the utility of using the neoprene units in a defective condition and the costs of curing and/or repairing said defects were relatively low, considering that the defects were of a dangerous nature since they emitted toxic chloroprene and HAPs into the air, soil, and water of the defined area where the Plaintiffs were located; and considering that the defects could have been gradually cured, repaired, and/or replaced over the course of the fifty (50)-plus years at low-costs, as curative action involved placement and/or replacement of caps, blind flanges, and/or plugs for the end of gas lines; new valves; and etc.

54.     Further, during all material times hereto, each of the Manufacturing Defendants, respectively, had a duty to keep the neoprene units and the PWF in a reasonably safe condition to prevent or avoid the creation of any unreasonable risk of harm to the Plaintiffs; to discover any unreasonably dangerous condition on the premises of the neoprene units and/or the PWF; and to either correct any dangerous conditions or warn the Plaintiffs of the existence of the dangerous conditions. During all material times hereto, each of the Manufacturing Defendants breached their respective duties by committing the following, non-exclusive, negligent, grossly negligent, and intentional acts and omissions:

   a.   Failing to utilize equipment sensitive enough to identify all leaks;

b.  Failing to conduct performance testing and reasonably monitor certain emission sources;
c.  Failing to replace leaking valves within required time limits,
d.  Failing to properly cap more than 500 open-ended lines;
e.  Failing to include appropriate emissions factors in air permit application materials;
f.  Failing to institute appropriate emissions controls for the chloroprene Group I storage tank, the surge control vessels, and the combustion chambers;
g.  Failing to maintain required destruction efficiency and minimum atomization flow rates;
h.  Failing to keep the neoprene units and the PWF in a reasonably safe condition;
i.  Failing to discover any unreasonably dangerous condition on the premises of the neoprene units and/or the PWF;
j.  Failing to correct the dangerous conditions mentioned hereinabove;
k.  Failing to warn the Plaintiffs of the existence of the dangerous conditions;
l.  Acting in a careless manner, and with utter disregard for human safety, health, and life of others, specifically the Plaintiffs; and
m.  Such other acts of negligence as will be shown at the trial of this matter.

55.    The defects proximately caused and/or were substantial factors in bringing about the continual emissions of harmful concentrations and/or doses of chloroprene and HAPs from the PWF into the defined areas; the Plaintiffs' exposure to hazardous doses of chloroprene and HAPs; and actual and continual successive damages and injuries suffered by the Plaintiffs. But for the above-mentioned defects, ruin, and/or vices, excessive and dangerous amounts of chloroprene and HAPs would not have been released into air, soil, and water within the defined areas, and the Plaintiffs would not have been exposed to hazardous concentrations and/or biological doses of chloroprene and HAPs, nor would they have suffered the resulting damages.

56.    During all material times hereto, the Manufacturing Defendants possessed information, such as reports, studies, logs, and/or data, created internally and by various local, state, and federal agencies, showing, citing, noting, and/or listing the defects contained on, in, or within the PWF and neoprene unit and their risks of harm to the Plaintiffs, while each of the Manufacturing Defendants had ownership, care, custody, and control of said premises. Therefore, during all material times, the Manufacturing Defendants had actual and/or constructive knowledge of the aforementioned unreasonable risks of harm to the Plaintiffs that the defects and/or defects created

by the Manufacturing Defendants presented. Further, the defects existed for such a period of time that the Manufacturing Defendants could have discovered said defects; and the Manufacturing Defendants could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care; but they failed to exercise such reasonable care, and their respective failures to do so are the cause-in-fact and legal causes of the Plaintiffs' damages and injuries.

### Count 3 – Products Liability, La. R.S. 9:2800.51 *et seq*.

57.     Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. During all material times, the chloroprene or chloroprene-containing products manufactured by the Manufacturing Defendants contained human disease and/or illness causing characteristics, making said products unreasonably dangerous and unreasonably dangerous per se to the Plaintiffs. During material times hereto, these defects include, without limitation, the following:

    a.   Defects in construction, composition, and design. When the chloroprene left the Manufacturing Defendants' control, the chloroprene deviated in a material way from their specifications or performance standards for chloroprene or chloroprene-containing products. The manufacturing Defendants have continued to manufacture chloroprene and chloroprene-containing products, using organic thiourea compounds as the vulcanization accelerators (hereinafter "ETU"), where there are equally suitable substances that have been made readily available, such as "ariaprene, guayule, neogreene, and thermocline;" and 12 alternative molecules which, by applying Quantitative Structure Activity Relationship (hereinafter "QSAR") evaluation techniques, are safer than ETU for vulcanizing the chloroprene;

    b.   Inadequate warning as pursuant to La. R.S. 2800.51. During material times hereto: At the time it left the Manufacturing Defendants' control, the chloroprene possessed inherent and known properties that make it unreasonably dangerous by presenting high potential for causing serious injury, such as respiratory disease, cancer, and other health problems to the Plaintiffs who would be foreseeably exposed to them; and lacked adequate or sufficient warning of the hazards these chloroprene or chloroprene-containing products would present in the course of their normal foreseeable use or intended use.

58.     During material times hereto, each of the Manufacturing Defendants owed respective duties to the Plaintiffs to manufacture chloroprene and chloroprene-containing products at the

PWF in such a manner as to prevent the Plaintiffs' harmful exposure to said products, by-products, and HAPs; and it owed a duty to use reasonable care in providing adequate warning to the Plaintiffs. During all material times hereto, each of the Manufacturing Defendants breached its respective duties by committing the following, non-exclusive, negligent, grossly negligent, and intentional acts and omissions:

a.  Failing to provide warning or adequate warning of the human hazards that chloroprene would present in the course of its normal foreseeable use or intended use;
b.  Failing to provide safety instructions or sufficient safety instructions for avoiding, preventing, mitigating, controlling, reducing, or eliminating the human health risks associated with the intended use of these chloroprene products;
c.  Failing to inspect these chloroprene products to assure sufficiency and adequacy of warnings and safety precautions;
d.  Failing to test or adequately test these chloroprene or chloroprene-containing products for defects or hazards they could present to the intended or foreseeable user;
e.  Failing to truthfully report or adequately report the results of chloroprene or chloroprene-containing product testing and medical studies associated with foreseeable hazards of these products by intended or foreseeable users;
f.  Failing to properly design the chloroprene products when there existed an alternative, equally suitable substance that was readily available when the chloroprene left the Manufacturing Defendants' control;
g.  Failing to recall these products mined, manufactured, sold, distributed and/or supplied
h.  Failing to properly store the chloroprene;
i.  Failing to properly package and/or load the chloroprene so that they could be safely transported, handled, stored or disposed of; and
j.  Such other negligent acts and omissions as will be shown at the trial of this matter.

59.    Due to the foregoing studies, reports, evidence, data, and/or their industry experience concerning chloroprene concentrations in the defined areas, human hazards from exposure, pathways to human exposure, complaints by Putative Class members, specifications, and the manufacturing process; the Manufacturing Defendants knew or should have known that the chloroprene they are manufacturing is unreasonably dangerous, inherently hazardous to human health, and requires adequate warning concerning said hazards. Instead of warning the Plaintiffs, the Manufacturing Defendants ignored or failed to disseminate such information, or condoned such failure to notify, not only in order to sell chloroprene and/or chloroprene-containing products,

but also to avoid both the costs of implementing safe manufacturing practices as well as litigation by those who were injured from chloroprene exposure. The Manufacturing Defendants chose profits over warranting the safety of these products that were manufactured, sold, supplied and/or used by Defendants; and, therefore, are liable to the Plaintiffs.

60.    The human disease and/or illness causing characteristics of the chloroprene proximately caused and/or were substantial factors in bringing about the manifestation of the Plaintiffs' injuries from exposure to said product. But for the above-mentioned dangerous characteristics, Plaintiffs would not have manifested the medical conditions, illnesses, and/or symptomology that the Plaintiffs have experienced. Further, the Plaintiffs' medical conditions and/or illnesses arose from the reasonably anticipated use of the chloroprene by the Manufacturing Defendants, which was the use of said product to manufacture neoprene at the PWF's neoprene units.

## Count 4 - Negligence and/or Gross Negligence of Plant Manager Defendants, Lavastida, Walsh, Grego, Pigeon, Glenn, and Caldwell

61.    Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the in the preceding paragraphs, as if fully set forth herein. At all material and respective times hereto, while operating, owning, and having custody of the PWF and its neoprene units, each of the Manufacturing Defendants had duties to ensure that the daily operations of the plant do not result in unsafe levels of chemical emissions into the air and water; prevent the exposure of the surrounding population, including the Plaintiffs, to dangerous levels of toxins, including chloroprene, in the ambient air; identify and remedy health, safety, and environmental risks to the public; ensure that the PWF and/or neoprene manufacturing business and/or units complied with

its DEQ permits; maintain safe operations; and implement systems and controls to ensure the health and welfare of individuals living in the defined areas, specifically the Plaintiffs.

62.     Upon information and beliefs, during all material times, the Manufacturing Defendants delegated those duties to the Plant Manager Defendants. DuPont delegated those duties to Defendants Pigeon, Glenn, Caldwell, Walsh, Grego, and Lavastida; and Denka delegated those duties to Defendants Lavastida upon obtaining ownership of the neoprene manufacturing business and/or units. For the forgoing reasons, the Plant Manager Defendants knew or should have known of the health risks (including the increased risk of cancer) posed by the toxic emissions from the PWF.

63.     Each of the Plant Manager Defendants have failed to exercise reasonable care and breached their respective duties by allowing the PWF and its neoprene units to continually emit excessive and hazardous amounts of chloroprene and other HAPs into the defined areas in amounts that have created and continue to create an unreasonable and foreseeable risk of harm to the Plaintiffs; have failed to prevent, abate, mitigate, avoid, and/or contain the chloroprene and HAPs emissions from the PWF by allowing permit violations, which, on information and belief, contributed to the unsafe levels of chloroprene and other HAPs in the ambient air, despite personal knowledge of the health risks and increased risk of cancer and dangerous non-cancerous medical conditions posed by the high level of chloroprene and HAPs emissions; have acted in a careless manner and with utter disregard for human safety, health, and life of others, specifically the Plaintiffs; and have failed to maintain safe operations. Said acts and omissions were and continue to be a significant contributing cause of actual damages suffered by the Plaintiffs, and it was foreseeable to the Plant Manager Defendants that their actions and omissions would cause grave harm to the Plaintiffs.

**Count 5 - Negligence and/or Gross Negligence of DEQ**

**64.**    Plaintiffs re-aver, adopt, allege, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. During all material times hereto, to avoid unreasonable risks of harm to persons in Louisiana, specifically, the Plaintiffs, DEQ has had, among others, the statutory duties of: "insuring the maintenance of a healthful and safe environment in Louisiana;" regulating and controlling matters pertaining to the "protection of air quality...; regulating solid and hazardous waste;"[27] and approving, monitoring, and enforcing the permits and state regulations under which each of the Manufacturing Defendants operated and/or operate the PWF and neoprene units during their respective manufacture of chloroprene and neoprene at or within the PWF and/or its neoprene units. Plaintiffs allege that, during all material times hereto, DEQ has breached its obligations in the following non-exclusive ways:

a.  Repeatedly failing to properly inspect, discover, cite, and/or note the facility and the Manufacturing Defendants' records; areas of non-compliance; apparent local and state permit and regulatory violations, in relation to the Manufacturing Defendants and Plant Manager Defendants' respective chloroprene and neoprene manufacturing activities at or near the PWF;

b.  Failing to ensure that the PWF and Manufacturing Defendants and Plant Manager Defendants were operating within the dictates of the aforementioned state permits and regulatory laws;

c.  Failing to warn the public about the true dangers of chloroprene and other HAPs emitting from the PWF;

d.  Working with the Manufacturing Defendants and Plant Manager Defendants to conceal these dangers and create a false sense of security;

e.  Failing to use its permitting powers to restrict the emissions of chloroprene and other harmful HAPs from the PWF to safe levels;

f.  Failing to properly inspect the facility and its records to discover and cite violations of regulations and permits related to chloroprene and other toxic emissions;

g.  Failing to ensure that the plant was operating within the dictates of the permits;

h.  Failing to perform its own testing and sampling to protect the health and safety of the individuals living near the PWF;

i.  Failing to take proper preventative measures/safeguards to prevent the exposure of the Plaintiffs to dangerous levels of chloroprene and the HAPs;

---

[27] La. R.S. § 36:231.

    j.  Misleading the Plaintiffs as to the serious health risks and dangers they faced as a result of being exposed to chloroprene and other HAPs;

    k.  Failing to timely or adequately issue a press release warning the public and Plaintiffs of the dangers and/or potential consequence of the emissions of chloroprene and other HAPs;

    l.  Failing to uphold its affirmative statutory duty to conduct routine sampling and testing of the air, water, and soil of the defined areas, for emissions and/or concentrations of chloroprene and/or HAPs being emitted from the PWF; and

    m.  Failing to protect the health and safety of Plaintiffs, despite the fact that damage and risk to Plaintiffs was reasonably foreseeable;

**65.**    These failures were the proximate cause or substantially contributed to the cause of the toxic emissions; and the resulting injuries and/or damages suffered by Plaintiffs were proximately caused by the forgoing fault and negligent, grossly negligent, and intentional acts and omissions of DEQ. Further, said acts and omissions by DEQ have caused and will continue to cause Plaintiffs to suffer actual, continual, and successive damages and injuries.

### Count 6 - Negligence and/or Gross Negligence of DHH

**66.**    Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. DHH has the statutory duty to develop and provide services to prevent disease and protect the health of persons in Louisiana, including the Plaintiffs."[28] Plaintiffs allege that, during all material times hereto, DHH has breached its obligations in the following non-exclusive ways:

    a.  Failing to warn the public about the true dangers of chloroprene and instead working with DuPont and Denka to conceal these dangers and create a false sense of security;

    b.  Failing to ensure that the PWF and Manufacturing Defendants and Plant Manager Defendants were operating within the dictates of the state permits and regulatory laws;

    c.  Failing to perform its own testing and sampling to protect the health and safety of the individuals living near the Pontchartrain Works facility;

    d.  Failing to take proper preventative measures/safeguards to prevent the exposure of the Plaintiffs to dangerous levels of chloroprene and the HAPs;

    e.  Failing to adequately, timely, and properly investigate complaints if illnesses from students and other members of the Putative Class;

    f.  Misleading the Plaintiffs as to the serious health risks and dangers they faced as a result of being exposed to chloroprene and other HAPs;

---

[28] La. R.S. § 36:251.

g.  Failing to timely or adequately issue a press release warning the public and Plaintiffs of the dangers and/or potential consequence of the emissions of chloroprene and other HAPs;

h.  Failing to uphold its affirmative statutory duty to conduct routine sampling and testing of the air, water, and soil of the defined areas, for emissions and/or concentrations of chloroprene and/or HAPs being emitted from the PWF; and

i.  Failing to protect the health and safety of Plaintiffs, despite the fact that damage and risk to Plaintiffs was reasonably foreseeable.

67.  These failures were the proximate cause or substantially contributed to the cause of the toxic emissions, and the resulting injuries and/or damages suffered by Plaintiffs were proximately caused by the forgoing fault and negligent, grossly negligent, and intentional acts and omissions of DHH. Further, said acts and omissions by DHH have caused and will continue to cause Plaintiffs to suffer actual, continual and successive damages and injuries, which are continuing.

### Count 7 - Civil Battery

68.  Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. During their manufacture of chloroprene and neoprene, the Manufacturing Defendants have known of and/or have possessed internal and external studies, air samples, reports, and findings, showing and establishing that:

a.  Chloroprene and HAPs are continually being emitted today [*emphasis added*] by Denka from the PWF and/or PWF's neoprene units, into the air, water, persons, and property of the Plaintiffs; and/or into the defined areas where the Plaintiffs breath and come into contact with the ambient air near or surrounding the PWF;

b.  That said emissions have been occurring for over fifty years by each of the Manufacturing Defendants;

c.  The pathways to human exposure to chloroprene include inhalation, dermal, ingestion, oral, and direct eye contact; and that various health illnesses and conditions are caused by such exposure to chloroprene;

d.  The Plaintiffs, students, other members of the community surrounding the PWF are actually being exposed by chloroprene being emitted by Denka from the PWF;

e.  The Plaintiffs, students, other members of the community surrounding the PWF, previous DuPont workers, and others reported in epidemiology studies have complained of the same physical symptoms, conditions, and/or illnesses, due to their exposure to chloroprene; and

f.  Members of the surrounding community have been harmed and/or find the emissions of chloroprene into ambient air and/or chloroprene exposure and/or contact to be offensive, considering the protests, lawsuits, and other adversarial action taken by the Plaintiffs, others living, working, and attending school within the defined areas, and individuals

present near DuPont's Kentucky neoprene plant, against the Manufacturing Defendant, on account of their emissions of chloroprene from the PWF.

69.     Considering the forgoing, during all material times hereto, through their continuous toxic emissions; and the Manufacturing Defendants' refusal to reduce or abate said emissions to safe levels, the Manufacturing Defendants either consciously desired and/or knew with substantial certainty that their chloroprene emissions from the PWF would cause the plaintiffs to suffer harmful or offensive contact from, with, or by said chloroprene.

### Count 8 - Nuisance Under Louisiana Civil Code Articles 667, 668, and 669

70.     Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the in the preceding paragraphs, as if fully set forth herein. As owners of the PWF and/or PWF's neoprene units, the Manufacturing Defendants had a duty to use that property or make any work on it in such a manner not to injure another. However, each of the Manufacturing Defendants have breached its duties by causing, allowing, permitting, aiding, and/or furthering the toxic emissions during the manufacture of chloroprene and/or neoprene, causing the Plaintiffs to suffer the aforementioned actual damages from exposure to chloroprene, such as physical discomfort in the forms set forth in the class definition (e.g. respiratory, skin, and eye irritation), along with smelling noxious odors.

71.     Plaintiffs own property within the defined areas and concentrations of chloroprene; and they have been and continue to be deprived of their right of enjoyment of said property, among other properties, due to the concentration and presence of chloroprene in the air; the noxious odors from chloroprene; the injuries and exacerbation of pre-injuries that exposure to chloroprene causes the Plaintiffs to suffer; their fear of stepping outside their homes and breathing or otherwise being exposed to chloroprene in the air via inhalation and direct skin and eye contact; and their fear of said exposure causing physical illness and/or injury to them and/or an exacerbation of physical

injury and/or illness to them. For instance, the Plaintiffs cannot even step outside and walk about their lawn to enjoy just being outside, perform yard work, or make plantings upon their grounds.

72.     Further, for the reasons mentioned in the above paragraphs and at all material times hereto, Denka and DuPont either knew, or, in the exercise of reasonable care, should have known that their chloroprene and neoprene manufacturing activities would cause damage and deprive the Plaintiff and Putative Class of the enjoyment of their properties and that the damages could have been prevented by the exercise of reasonable care mentioned hereinabove by the Manufacturing Defendants to prevent the Plaintiffs from being exposed to toxic concentrations and/or doses of chloroprene; and the Manufacturing Defendants continued to fail to exercise such reasonable care.

**Count 9 - Trespass Under Louisiana Civil Code Article 2315**

73.     Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein. During all material times hereto, the emissions of chloroprene by the Manufacturing Defendants and currently by Denka have, without and in contravention to the authority or consent from the Plaintiff, physically invaded the land and/or soil of the grounds and living quarters of the Plaintiffs' homes where they physical reside, continuously, causing them to suffer continuous and successive damages in the form of mental and physical pain, anguish, distress, and inconvenience, due to their exposure to said chloroprene. As set forth hereinabove, the Plaintiffs have been deprived of the use and enjoyment of their property for which said trespass has proximately caused and/or has been a substantial factor in causing.

**Count 10 - Conspiracy to Commit Fraud/Misrepresentation**

74.     Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. The Defendants have conspired to mislead the public, including the Plaintiffs and others living near PWF, by misrepresenting and suppressing

the truth about the human dangers of exposure to chloroprene and other HAPs emitted from the facility and the risks faced by the communities around the facility. Such misrepresentation and suppression include, by way of example, statements that Denka communicated to the public through its website, statements that Denka and Mr. Lavastida communicated to the public through a mass mailing, public statements made by DHH through its Medical Director, Jimmy Guidry, and public statements made by DEQ through its Secretary, Chuck Brown. On information and belief, these statements were made with the knowledge that they were false and likely to mislead the public. Furthermore, on information and belief, DuPont, Denka, DEQ, DHH, and Mr. Lavastida acted jointly and in concert with the common goal of allaying public concern so that Denka could continue its profitable business operations without interruption or reduction.

75.     Additionally, many members of the public, including Plaintiffs, have relied on the misrepresentations by these Defendants by remaining in their communities near the facility and thus suffering further harm from toxic chemical exposure, whereas they would have moved away from the area if they had been aware of the full extent of the danger. The Defendants' overt, persistent, and ongoing tortious emissions of chloropropene and concealment of the truth about the human dangers of exposure to chloroprene and other HAPs emitted from the facility and the risks faced by the communities around the facility, have been continuous and have not been abated, causing the Plaintiffs to suffer successive and continues damages in the same form.

76.     Both DEQ and DHH conspired with Denka and its officials to defraud the public about the dangers of chloroprene emissions. Although DEQ and Denka expressly stated in the January 2017 AOC that the AOC was confected as a result of the EPA's 2011 NATA results in order to reduce Denka's chloroprene emissions by 85%, DEQ, DHH and Denka officials publicly rejected the EPA's finding of an increased risk of cancer for citizens in the surrounding community. Their

public denial of the dangers of chloroprene emissions misled the Plaintiffs and other citizens of St. John the Baptist Parish, who relied on their public comments.

## Count 11 - Res Ipsa Loquitur

**77.**    Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. In addition to the negligence stated above, and in the alternative thereto, the injuries and damages suffered by the Plaintiffs were caused by acts or omissions of the Defendants, which acts or omissions may be beyond proof by the Plaintiffs herein, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the forgoing toxic emissions, exposure, and injuries resulted from the negligence of the Defendants. Furthermore, the incident would not have occurred had the Defendants exercised the degree of care imposed on them and Plaintiffs, therefore plead the doctrine of res ipsa loquitur.

## Count 12 – Request for Declaratory Judgment

**78.**    Plaintiffs re-aver, adopt, and incorporate herein, all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. La. Const. art. I, § 1 provides:

> "All government, of right, originates with the people, is founded on their will alone and is instituted to protect the rights of the individual and for the good of the whole. Its only legitimate ends are to secure justice for all, preserve peace, protect the rights, and promote the happiness and general welfare of the people." "The rights enumerated in this Article are inalienable by the state and shall be preserved inviolate by the state."

**79.**    By their forgoing tortious acts and omissions causing the toxic chloroprene emissions into the defined areas where the Plaintiffs are located, the Defendants have directly violated and permitted, allowed, aided, and/or continued the violation of the Plaintiffs' constitutional rights of general welfare and happiness under La. Const. art. I, § 1; their rights to good health and welfare under La. Const. art. IX, § 1; and their rights to enjoy and use the properties under La. Const. art.

I, § 4. Due to said violations, the Plaintiffs have suffered and will continue to suffer irreparable injury, loss, and damage, absent the granting of an injunction prohibiting Denka from emitting chloroprene from the PWF into the air of the defined areas in excess of the thresholds known to cause cancerous and non-cancerous medical conditions and illness to the Plaintiffs, including but not limited to the EPA's acceptable risk threshold of 0.2 micrograms per cubic meter.

80.     Upon information and beliefs, Denka will continue to emit, discharge, and/or release chloroprene into the air from the Pontchartrain Works Facility at levels of the thresholds known to cause cancerous and non-cancerous medical conditions to the Plaintiffs for a long duration of time without the intent to reduce said emissions to acceptable levels, threatening irreparable injury or loss resulting to the Plaintiffs without the issuance of a preliminary injunction and other than remedies available to the Plaintiffs for their irreparable injuries that are being caused by the Defendants' violations of the Plaintiffs' constitutional rights.

81.     Therefore, the Plaintiffs request that this Honorable Court issue a preliminary injunction directed unto Defendant, Denka, restraining, enjoining, and prohibiting it, or any other persons, entities, firms, corporations or partnerships acting or claiming to act on its behalf from, in any manner whatsoever, from discharging, emitting, and/or releasing chloroprene into the air from the PWF at levels in excess of 0.2 micrograms (mcg) per cubic meter or at levels in excess of what this Court otherwise finds to be safe or in compliance with the Plaintiffs' forgoing constitutional rights. The gravity of the aggregate damages and hardships the Plaintiff and Putative Class members continue to sustain in medical bills, pain and suffering, loss of wages, and loss of earning capacity due to Denka's toxic emissions, are far greater than the costs and/or hardships that Denka would sustain by placing the appropriate controls and/or equipment at the PWF to abate the aforementioned toxic emissions.

82.    In due course, the Plaintiffs also request that this Court order the issuance of a permanent injunction in the form and substance of the preliminary injunction.

## VI.    CLASS ACTION ALLEGATIONS

83.    Plaintiffs re-aver, adopt, and incorporate throughout this entire section ("Class Action Allegations"), all previous allegations set forth in the preceding paragraphs, as if fully set forth herein. Pursuant to La Code Civ. Proc. art. 591, the named Plaintiff herein proposes to proceed individually and as representative of a class of persons defined as follows:

> "(1) Those persons who, at any time from January 1, 2011 through the present, have lived, worked, attended school, and/or actually resided within a geographical boundary of St. John the Baptist Parish (hereinafter referred to as "St. John"), starting at the northwest corner of zip code 70084, then proceeding eastward along I-10 through zip code 70084 and the southside part of zip code 70068, to the northeast corner of the class boundary where Interstate-10 meets the St. John line within zip code 70068 of St. John, then proceeding southward within St. John along the St. John boundary line over the Mississippi River and through zip code 70057 in St. John to LA Hwy. 3127 within zip code 70049, then proceeding west/southwest along LA Highway 3127 within zip code 70049, to the southwest corner of the class boundary where LA Highway 3127 meets the St. John parish line within zip code 70049, then proceeding northward within St. John along the St. John parish line, through zip codes 70049, 70090 70051, and 70084 to I-10 within zip code 70084 (hereinafter referred to as "defined areas"); and
>
> (2) who experienced one or more of the following physical symptoms: headaches; sinus problems; dizziness; insomnia; trouble breathing, respiratory irritation, or other respiratory problems; chest pains; acute cardiac palpitations; acute gastrointestinal disorder; acute bronchitis; acute onset of asthma; exacerbation of pre-existing asthma; fatigue; nausea; skin rash; temporary hair loss; chronic coughing; chronic nasal discharge; chronic cardiovascular disorder; chronic throat irritation; chronic eye irritation; chronic thyroid disorder; anxiety; and depression, resulting from their exposure to chloroprene and/or chloroprene-containing substances emitted, released, and/or leaked from the PWF."

84.    This class may be easily determined through objective documentation of property records showing ownership, and/or lease agreements documenting residence in the defined area; school attendance records, employment records, and various other legal filings and public records.

### A.    **"Numerosity"**

**85.**    The Class consists of a total number of class members within the defined area who are so numerous that joinder of all members is impracticable but at the same time, it is a definable group of aggrieved persons. Class members can be informed of the pendency of this action by print, internet, and broadcast notice. Many will also receive notice by U.S. mail.

### B.    **"Superiority"**

**86.**    Questions of law and fact common to all members of the Class predominate over any individualized claims and questions of law of any Putative Class Member, such that class action format will be superior to other available methods for fairly and efficiently adjudicating the controversy. Plaintiff has been litigating the claims on behalf of all Putative Class members since May 31, 2018, against DuPont, Denka, DHH, and DEQ. A class definition with geographic boundaries and the defined class would make the litigation easily manageable as a class, as it would allow the parties and this Court to reasonably anticipate the persons that may assert claims arising from the harmful and preventable chloroprene emissions; and giving Putative Class members enough information to ascertain whether they are in the class definition and to enable them to decide whether to opt out; and what forum will be controlling or govern all of their claims.

### C.    **"Commonality"**

**87.**    This common issue herein would resolve a question that is central to the validity of each one of the Plaintiffs claims. The factual basis of Defendants' outrageous conduct are common to all Putative Class members and represent a common thread of reckless conduct, gross negligence and willful, wanton, and reckless indifference for the rights of others, resulting in injury to all members of the Class.

88.     Furthermore, the factual basis of Defendants' outrageous conduct are common to all Plaintiffs and represent a common thread of reckless conduct, gross negligence and willful, wanton, and reckless indifference for the rights of others, resulting in injury to all members of the Class. The Plaintiffs' claims arise from the same course of decision-making and events, and each Plaintiffs will make similar legal and factual arguments to prove Defendants' outrageous, willful, reckless, wanton, and deplorable conduct and liability. Additionally, the Putative Class' claims depend upon a common contention—namely, DuPont and Denka's liability for exposing the Putative Class to toxic emissions of chloroprene from the PWF.

89.     Because Defendants' conduct here is governed by Louisiana state regulations and law, the Class members will be subject to common questions of law, including but not limited to:

a.  Whether Defendants' acts and omissions alleged herein constitute negligence as complained and under Louisiana state law;
b.  Whether Defendants' acts and omissions alleged herein constitute gross negligence and wantonness under Louisiana state law;
c.  Whether Defendants' acts and omissions alleged herein constitute trespass under Louisiana state law;
d.  Whether Defendants' acts and omissions alleged herein constitute civil battery under Louisiana state law;
e.  Whether Defendants' acts and omissions alleged herein constitute nuisance under Louisiana state law;
f.  Whether Defendants' acts and omissions alleged herein constitute strict liability under Louisiana state law;
g.  Whether Defendant's acts and omissions alleged herein constitute Louisiana constitutional violations, such as violations of the Plaintiffs' rights under La. Const. Arts. I, § 1; La. Const. art. I, § 4; La. Const. art. IX, § 1; and La. Const. art. I, § 24;
h.  Whether Defendant's acts and omissions alleged herein constitute Louisiana statutory violations, such as violations of the "Louisiana Environmental Quality Act" under La. R.S. 30:2001 et seq.; and other Louisiana statues, such as the "Air Control Law;" "Hazardous Waste Control Law," "Hazardous Materials Information Development, Preparedness, and Response Act;" "Hazardous Material Hotline;"
i.  Whether Plaintiff and Putative Class have sustained damages and, if so, what the proper measure of those damages under Louisiana state law are;
j.  Whether Plaintiff and Putative Class are entitled to the relief sought, including monetary relief and attorneys' fees under Louisiana state law;
k.  Whether the Defendants provided adequate warning and disclosure of the risk of exposure to chloroprene emissions to the Plaintiffs under Louisiana state law;

l.   Whether the Defendants provided adequate warning about the vices and/or defects within or of chloroprene itself;

m.   Whether the Defendants provided adequate warning and disclosure of the harmful effects of exposure to chloroprene emissions under Louisiana state law;

n.   Whether the Defendants failed to properly and timely investigate the chloroprene emissions under Louisiana state law;

o.   Whether the Defendants failed to timely and adequately test, sample, and/or measure the level of chloroprene emissions from the PWF under Louisiana state law;

p.   Whether the Defendants intentionally concealed and/or misled the Plaintiff and Putative Class regarding the concentrations of chloroprene being emitted;

q.   Whether the Defendants intentionally concealed and/or misled the Plaintiff and Putative Class regarding the hazardous effects of human exposure to chloroprene; and

r.   When each of the Defendant's obtained knowledge of excessive chloroprene emissions.

### D.   "Typicality"

**90.**   Plaintiff's (class representative) claims are typical of those of the greater proposed class; the representative Plaintiff is a member of the class as defined hereinabove; and, like all Putative Class members, was placed at risk of adverse health effects and/or other harms caused by exposure to chloroprene which arise out of the same event, practice, or course of conduct giving rise to the claims of the other class members and are based on the same legal theory(ies). The represented Plaintiff has sustained the same injuries from the same toxic exposure of chloroprene emissions from the Denka PWF due to the Defendants' tortious acts and omissions and her interests in the personal injury remedies are identical to those of the Putative Class members. Further, each of the Plaintiffs' claims arises from the same decision-making and events, and each Plaintiffs will make similar legal and factual arguments to prove each of the Defendant's negligent, outrageous, grossly negligent, willful, reckless, and wanton conduct and liability under the same legal theories asserted in herein.

### E.   "Adequacy of Representation"

**91.**   The representative Plaintiff will fairly and adequately protect the interests of the Putative Class as: **(1)** Plaintiff's claims are not antagonistic or in conflict with those of other Putative Class

members; (**2**) Plaintiff has a sufficient interest in the outcome to ensure vigorous advocacy; and (**3**) counsel for Plaintiff is competent, experienced, qualified, and generally able to conduct the litigation vigorously. Additionally, the representative Plaintiff possesses a strong personal interest in the subject matter of the lawsuit, given that she has a high interest in the abatement of the chloroprene emissions and payment of damages for the injuries she has sustained, considering that she continues to be exposed to the same hazardous levels of chloroprene, and she suffers with the same physical conditions as the proposed class members. As mentioned hereinabove, all of her claims arise from the same legal theory and course of conduction as the rest of the proposed class.

92.    Plaintiff has retained counsel with substantial experience in prosecuting environmental, mass tort, and complex class actions, including actions involving environmental contamination in the U.S. District Court for the Eastern District of Louisiana.[29] Among the undersigned counsel for Plaintiffs are counsel who represent Putative Class Members and are counsel with experience in complex class action litigation and trials. Plaintiff is represented by experienced counsel in class actions, and her Counsel has the legal knowledge and the resources to fairly and adequately represent her interests.

## VII.    DAMAGES

93.    Because of the aforementioned intentional misconduct, negligence, and/or gross negligence of defendants, the Plaintiffs have suffered severe, disabling injuries, which are continuing, for which they seek the following past, present, and future damages: physical injuries; future emotional distress; pain and suffering; medical monitoring; fear of cancer; loss of wages; loss of earning capacity; medical expenses and pharmaceuticals; enjoyment of life; annoyance,

---

[29] **Notable Cases**: *In Re: Oil Spill by the Oil Rig*, "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179, U.S. District Court, Eastern District of Louisiana; *IN RE: FEMA Trailer Formaldehyde Products Liability Litigation* (Louisiana Plaintiffs), No. 12–30635, U.S. District Court, Eastern District of Louisiana.

discomfort and inconvenience; expert fees, costs, and expenses; exemplary and/or punitive damages; attorney fees; and inflationary adjustments and judicial interest from the date of judicial demand to the forgoing damages; all court costs associated with this action; and such other and further relief as this Honorable Court deems just and proper.

94.     Plaintiff, on behalf of herself and the Putative Class Members as defined herein, reserve all rights, claims, and/or causes of action that may exist now, or in the future, on account of the forgoing occurrences and conduct, against any and all of the Defendants; and allege that the Defendants, DENKA PERFORMANCE ELASTOMER, LLC, E.I. DUPONT DE NEMOURS AND COMPANY, DUPONT PERFORMANCE ELASTOMERS, LLC f/k/a DUPONT DOW ELASTOMERS, LLC, STATE OF LOUISIANA, THROUGH THE DEPARTMENT OF HEALTH, STATE OF LOUISIANA, THROUGH THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, JORGE LAVASTIDA, PATRICK WALSH, IVAN CALDWELL, WALTER GLENN, DAVID PIGEON, and DORIS GREGO, are liable jointly and *in solido* to the Plaintiff, individually, on behalf of the Putative Class Members, for the full sum of their aforementioned damages.

## VIII.   <u>MEDICAL MONITORING</u>

95.     For the forgoing reasons, Plaintiffs have suffered significant exposure to a proven hazardous substance, namely chloroprene; as a proximate result of this exposure Plaintiffs suffer a significantly increased risk of contracting serious latent disease, such as cancers, due to their exposure to chloroprene; Plaintiffs' risk of contracting such serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease. Monitoring procedure exists that makes the early detection of the disease possible, such as liver function tests, pulmonary assessment

testing; chest radiography; sputum cytology; peripheral neuropathy evaluation; biochemical tests, clearance tests, antipyrine tests, and others. Said monitoring procedures have been prescribed by qualified physicians and are reasonably necessary according to contemporary scientific principles.

## IX.    DEMAND FOR TRIAL BY JURY

96.    Plaintiff demands a trial by jury as to all those issues triable as of right.

## X.    PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff prays that each of the Defendants be served with a certified copy of this Second Amending Class Action Petition and citation and summons thereof; that they be cited to appear and answer same; that after due proceedings be had, this action be certified as a class action pursuant to La. C.C.P. Art. 591 *et seq*., for the purposes of determining common issue of liability for compensatory damages; that upon certification of class action, the court calls for the formulation of a suitable management plan pursuant to La. C.C.P. Art. 593.1 (C); that after due proceedings be had, there be a judgment in favor of Plaintiffs and against the Defendants, holding them liable jointly and *in solido* to Plaintiff and all Putative Class members for compensatory damages; that the rights of all Plaintiffs to establish their entitlement to compensatory damages be served for determination in their individual actions where appropriate; that the request for for Preliminary Injunctive Relief be herein issued; medical monitoring for development of cancer and other maladies due to chloroprene exposure; that Plaintiffs recover any and all costs of this proceeding, including attorneys' fees and expenses; awarding punitive damages to the extent permitted under any applicable law; awarding the damages cited hereinabove; awarding interest on all damages from the date of judicial demand, for all general and equitable relief; and that there be a trial by jury.

Respectfully submitted:

*/s      Danny Russell*
**RUSSELL LAW FIRM, LLC**
733 E. Airport Ave., Ste. 201
Baton Rouge, LA 70806
Telephone: (225) 307-0088
Facsimile: (225) 307-0087
danny@dannyrusselllaw.com

### Certificate of Service

I hereby certify that on January 25, 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.

_____   *s/ Danny Russell*_____