UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JUANEA L. BUTLER                                    CIVIL ACTION

v.                                                  NO. 18-6685

DENKA PERFORMANCE ELASTOMER LLC, ET AL.             SECTION "F"

ORDER AND REASONS

Before the Court are four motions to dismiss this case under
Rule 12(b)(6) by the State of Louisiana through the Department of
Environmental Quality, the State of Louisiana through the
Department of Health, Denka Performance Elastomer LLC, and E.I.
DuPont de Nemours and Company. For the following reasons, the
motions are GRANTED.

**Background**

This environmental tort litigation arises from the production
of neoprene at the Pontchartrain Works Facility ("PWF") in St.
John the Baptist Parish. Neoprene production allegedly exposes
those living in the vicinity of the PWF to concentrated levels of
chloroprene well above the upper limit of acceptable risk, and may
result in a risk of cancer more than 800 times the national
average.

Juanea L. Butler has lived in LaPlace, Louisiana since 1998.
She sued the Louisiana Department of Health ("DOH"), the Louisiana

1

Department of Environmental Quality ("DEQ"), Denka Performance Elastomer LLC ("Denka"), and E.I. DuPont de Nemours and Company ("DuPont") seeking class certification, damages, and injunctive relief in the form of abatement of chloroprene releases from her industrial neighbor, the PWF. These facts are drawn from the allegations advanced in her Class Action Petition for Damages, originally filed on June 5, 2018 in the 40th Judicial District Court for St. John the Baptist Parish.[1]

Effective November 1, 2015, DuPont sold the PWF to Denka, but DuPont retained ownership of the land underlying the facility. In December 2015, the Environmental Protection Agency ("EPA") released a screening-level National Air Toxics Assessment ("NATA"), and classified chloroprene as a likely human carcinogen. EPA's NATA evaluation suggested an acceptable risk exposure threshold for chloroprene: 0.2 µg/m³; that is, chloroprene emissions should stay below .2 micrograms per cubic meter[2] to comply with the limit of acceptable risk threshold (which is a risk of 100 in one million people).

---

[1] An amended petition filed in state court amended only the proposed class definition.
[2] The concentration of an air pollutant is measured in units of density.

The EPA held its first Parish community meeting to discuss the potential chloroprene emission issues on July 7, 2016. At that meeting, a DOH representative advised that children should not breathe chloroprene. In August of 2016, Denka began 24-hour air sampling every six days. Samples collected at five sampling sites are and continue to exceed the 0.2 µg/m³ threshold. According to Denka's own sampling numbers for chloroprene concentrations, the average chloroprene concentration across all sampling sites from August 2016 to March 2017 has ranged from 4.08 µg/m³ to 6.65 µg/m³.

The EPA has noted that, in addition to the high risk of cancer from exposure to chloroprene, symptoms include

> headache, irritability, dizziness, insomnia, fatigue, respiratory irritation, cardiac palpitations, chest pains, nausea, gastrointestinal disorders, dermatitis, temporary hair loss, conjunctivitis, and corneal necrosis.

The EPA has further detailed that

> acute exposure may: damage the liver, kidneys, and lungs; affect the circulatory system and immune system; depress the central nervous system; irritate the skin and mucous membranes; and cause dermatitis and respiratory difficulties in humans.

On October 7, 2016, Denka submitted modeling results for chloroprene concentrations surrounding the PWF to the Louisiana Department of Environmental Quality ("DEQ") for the period of 2011 through 2015, showing concentrations well above the 0.2 µg/m³ threshold. At a meeting on December 8, 2016, DEQ Secretary Chuck

3

Brown dismissed those expressing concern about the chloroprene concentrations as "fearmongerers" and said "forget about 0.2[μg/m³]."

The EPA's National Enforcement Investigation Center ("NEIC") conducted a Clean Air Act ("CAA") inspection of the Pontchartrain Works facility in June 2016. A copy of the redacted inspection report from the EPA's CAA inspection was publicized on April 3, 2017. The NEIC inspection report revealed various areas of non-compliance by both DuPont and Denka in their operation of the facility, including failure to adhere to monitoring, recordkeeping, and reporting requirements for the chloroprene vent condenser; failure to replace leaking valves; failure to include appropriate emissions factors in air permit application materials; and failure to institute appropriate emissions controls for the chloroprene Group I storage tank.

In her original and amended class action petition, Ms. Butler alleges that DuPont and Denka have and continue to emit chloroprene at levels resulting in concentrations exceeding the upper limit of acceptable risk. The plaintiff further alleges that DEQ and DOH failed to warn the plaintiff and her community about chloroprene exposure. She alleges that:

> Due to the Plaintiff's exposure to the chloroprene emissions, she has experienced symptoms attributable to exposure of said

chemical. Since April 2012 until current date, the Plaintiff has continually sought medical attention for the following conditions: acute bronchitis; coughing; throat irritation; redness and swelling; nasal blockage, congestion, and sneezing; sinusitis and nasal polyps; exacerbation of pre-existing asthma; shortness of breath; wheezing; rhinosinusitis; thyroid enlargement; cardiac problems; nausea; vomiting; headaches; fatigue; epistaxis (nose bleeds); anxiety; depression; insomnia; and temporary hair loss.

Seemingly at random, the plaintiff invokes as causes of action general Louisiana state constitutional provisions. She seeks injunctive relief in the form of abatement of chloroprene releases to "comply" with the EPA's suggested 0.2 µg/m³ threshold; damages for deprivation of enjoyment of life; damages for medical expenses; damages for loss of wages; damages for pain and suffering; punitive damages; and additional damages including medical monitoring to the extent personal injury claims become mature.

Denka and DuPont jointly removed the lawsuit, invoking this Court's diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). The Court denied the plaintiff's motion to remand. See Order and Reasons dtd. 1/3/19 (denying motion to remand); see Order and Reasons dtd. 2/20/19 (denying motion to reconsider). DuPont, Denka, DEQ, and DOH now move to dismiss the plaintiff's claims.

## I. Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for the dismissal of a complaint for failure to state a claim upon which relief can be granted. Such motions are rarely granted because they are viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014) (citing Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). The Court will not accept conclusory allegations in the complaint as true. Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

6

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at
555 (alteration in original) (citation omitted).

II.
*A.*

Under Louisiana Civil Code article 3492, "[d]elictual actions
are subject to a liberative prescription of one year. This
prescription runs from the day injury or damage is sustained."
When damages are not immediate, the action in damages is formed
and begins to prescribe "only when the tortious act actually
produces damage and not on the day the act was committed." <u>Tenorio
v. Exxon Mobil Corp.</u>, 170 So.3d 269, 274 (La. App. 5 Cir. 2015).
Thus, a plaintiff's injury has been sustained within the meaning
of La. C.C. art. 3492, "only when it has manifested itself with
sufficient certainty to support accrual of a cause of action." <u>Id.</u>
Here, on the face of the plaintiff's petition, prescription began
to run in April 2012; when she alleges she began to seek medical
attention for various ailments. In an attempt to defeat
prescription, the plaintiff invokes the doctrine of *contra non
valentem*.

*B.*

*Contra non valentem* is "an equitable doctrine that tolls
prescription for as long as 'a plaintiff acts reasonably to
discover the cause of a problem.'" <u>Jenkins v. Bristol-Myers Squibb</u>

Co., 689 F. App'x. 793, 796 (5th Cir. 2017) (citing <u>Chevron USA, Inc. v. Aker Mar., Inc.</u>, 604 F.3d 888, 894 (5th Cir. 2010)). Prescription does not run as long as it was reasonable for the victim not to recognize that the injury may be related to the tortfeasor's action. <u>Id.</u> However, "conclusive, dispositive proof of a causal connection between the suspected injury and the putative tortfeasor" is not necessary for the prescriptive period to begin. <u>Carter v. Matrixx Initiatives, Inc.</u>, 391 F. App'x. 343, 345-46 (5th Cir. 2010). Prescription begins to run when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that she is a victim of a tort. <u>Bartucci v. Jackson</u>, 246 F. App'x. 254, 258 (5th Cir. 2007). "An injured party has constructive notice when he or she possesses information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry, and includes knowledge or notice of everything to which that inquiry might lead." <u>Id.</u> (citing <u>Babineaux v. State ex rel. Dep't of Transp. & Dev.</u>, 927 S.2d 1121, 1123 (La. Ct. App. 2005).

DOH, DuPont, and Denka move to dismiss the plaintiff's tort claims on prescription grounds. The plaintiff counters that her claims are not time-barred, arguing that the doctrine of *contra non valentem* tolls the running of liberative prescription where

the cause of action is not known or reasonably knowable to the plaintiff.

Paragraph 24 of the petition alleges:

Due to the Plaintiff's exposure to the chloroprene emissions, she has experienced symptoms attributable to exposure of said chemical. Since April 2012 until current date, the Plaintiff has continually sought medical attention for the following conditions: acute bronchitis; coughing; throat irritation; redness and swelling; nasal blockage, congestion, and sneezing; sinusitis and nasal polyps; exacerbation of pre-existing asthma; shortness of breath; wheezing; rhinosinusitis; thyroid enlargement; cardiac problems; nausea; vomiting; headaches; fatigue; epistaxis (nose bleeds); anxiety; depression; insomnia; and temporary hair loss.

In other words, for more than six years prior to the filing of the plaintiff's petition, the plaintiff experienced and "continually" sought medical attention for a litany of medical issues; the same medical issues the EPA attributes to chloroprene exposure.[3] While a mere apprehension that something is wrong is insufficient to start the running of prescription, if the injury should put a reasonable person on guard to call for an inquiry, then the prescription period begins to run. Seeking medical

---

[3] The plaintiff now argues that the two sentences of paragraph 24 be read separately to allege that while she began experiencing symptoms in April 2012, she was unaware that chloroprene was the cause of her condition. The Court disagrees. On its face, paragraph 24 alleges that chloroprene exposure is responsible for her medical symptoms and she has suffered from those symptoms since April 2012. Even indulging the plaintiff's dance on a pin argument, constructive notice is sufficient.

attention for approximately 20 symptoms consistently for years would put a reasonable person on guard to inquire into why she is suffering persistently with so many symptoms. Based on the plaintiff's allegations, the prescription period would have commenced within a year (or at most two) of seeking medical attention and would have expired a year later.

Significantly, dispositive proof of a causal connection is not required for the prescription period to begin -- *contra non valentem* will not protect a plaintiff's claim from prescription when her own willfulness or neglect caused her ignorance. Loupe v. Avondale Shipyards*,* 470 So.2d 336, 338 (La. App. 5 Cir. 1985). Even if the Court assumes that the prescription period would not run until the plaintiff had constructive knowledge that chloroprene exposure from the PWF could cause her symptoms, in July 2016, a DOH representative advised that children should not breathe chloroprene. Thus, the plaintiff had constructive knowledge regarding the potential harm that she had suffered as a result of chloroprene exposure at the time of the July 2016 community meeting, and prescription would have run by July 2017, about a year before the plaintiff filed her original petition.[4]

---

[4] The plaintiff notes in her sur-reply memorandum that the filing of a similar class action petition, Taylor v. Denka Performance Elastomer LLC, whose proposed class definition would have made her a putative class member, suspended the running of the prescription

Even if she had constructive knowledge to put her on guard, the plaintiff contends that DOH's alleged failure to warn the public, and DuPont and Denka's alleged continuous emission of harmful levels of chloroprene, implicate the continuing tort doctrine.

"The continuing tort doctrine is a jurisprudentially recognized exception to the general rules of prescription." Watters v. Dept. of Soc. Serv., 15 So.3d 1128, 1158 (La. App. 4 Cir. 2009). The doctrine provides that "[w]hen the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated." S. Cent. Bell Tel. Co. v. Texaco, Inc., 418 So.2d 531, 533 (La. 1982). "When the tortious conduct is continuous and gives rise "to successive damages, prescription dates from cessation of the wrongful conduct causing the damage." Id. If the wrongful act has been completed, but the plaintiff continues to experience injury even without further conduct by the tortfeasor, no continuing tort is found. Hogg v. Chevron USA, Inc. 45 So.3d 991, 1005 (La. 2010).

---

period under American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974) until 30 days after a final appeal. Even if the Court assumes that this is true for purposes of the EPA report, according to the plaintiff's allegations, the prescription period had already run by 2013, years before the filing of Taylor.

Here, the plaintiff alleges that DOH's tortious conduct included a failure to warn the public in two instances: first, after the July 2016 meeting, and second, more generally, when DOH had information about the alleged negative health effects of chloroprene. But the continuing tort doctrine applies to continuing conduct, not to individual acts. The plaintiff does not allege, other than the conclusory allegation that DOH continues to mislead the public, what specific conduct is ongoing. Even if the plaintiff alleges that she continues to be injured, she does not allege facts that would support a finding that it is DOH's conduct that continues to injure her. The continuing tort doctrine is not implicated for DOH; even if the plaintiff could allege some sort of tort claim against DOH, any such claim is prescribed and not saved by the continuing tort doctrine.

As for DuPont, the plaintiff's allegations are self-defeating and the application of the continuing tort doctrine fails to save any tort alleged against DuPont.[5] Prescription began from the date DuPont's operation of the PWF ceased. DuPont sold the PWF to Denka on November 1, 2015; prescription expired one year later. The

---

[5] Of course, insofar as the plaintiff attempts to pursue an injunctive remedy against DuPont, any such claim must be dismissed for lack of standing for the same reasons articulated in Taylor v. Denka Performance Elastomer, LLC, 332 F. Supp. 3d 1039, 1044 (E.D. La. 2017).

plaintiff submits, wrongly, that prescription is tolled until the plaintiff also has actual or constructive knowledge of any damages sustained from the conduct. The continuing tort doctrine is tethered to a defendant's tortious conduct, not any knowledge of the potential identity of the tortfeasor. Thus, any cause of action for damages accruing from medical conditions beginning in 2012 would have expired by November 1, 2016 – one year after DuPont ceased operating the PWF.

As for Denka, it is alleged that it continues to operate the PWF, emitting chloroprene and, thus, for purposes of the continuing tort doctrine, Denka's conduct has not abated. The plaintiff also alleges that she continues to suffer injuries from emissions. These allegations invoke the continuing tort doctrine; thus, the prescriptive period as to any tort claim against Denka has not begun because Denka's conduct has not abated.

Accordingly, based on the plaintiff's allegations, any tort claims against DOH and DuPont have prescribed and, thus, their motions to dismiss are granted.[6] The Court now turns to DEQ's submission that the plaintiff's claims against it are not viable

---

[6] While DEQ did not raise the issue of prescription, the Court notes that the running of the prescription period would similarly apply to DEQ. Likewise, the continuing tort doctrine would be inapplicable, where the plaintiff has alleged specific (yet allegedly inadequate) instances of the agencies' warnings regarding the health implications of exposure to chloroprene.

14

because they concern regulatory, not civil, matters before moving to Denka's remaining arguments that the plaintiff fails to state a plausible claim for relief.

III.

Like DOH, the plaintiff seeks to hold DEQ liable for its purported failure to warn the community regarding the risks of chloroprene exposure. The plaintiff alleges that DEQ failed to provide notice concerning the high levels of chloroprene emissions and seeks to recover damages for its alleged negligence. DEQ contends that any purported agency duty to warn the public is a regulatory matter, not a traditional civil matter, and thus, is not delegated by Louisiana's legislature to the courts.[7]

DEQ has "jurisdiction over matters affecting the regulation of the environment within the state, including but not limited to the regulation of air quality . . . ." La. R.S. 30:2011. The Secretary of DEQ must provide notice of violations of DEQ

---

[7] DOH similarly contends that the plaintiff alleges no facts that would support a finding of a duty. The plaintiff invokes several Louisiana state statutes, which she alleges show that DOH had a duty to investigate and warn the public. But the Louisiana state statutes invoked by the plaintiff concern DOH's duty relating to sanitation matters, not air quality. DOH is responsible for state environmental quality functions only as delegated to it by the legislature. The legislature has specifically delegated powers and duties with respect to air quality control to DEQ, not DOH. Thus, even in the absence of prescription, it seems no plausible tort claim has been stated against DOH.

regulations, and other policies and procedures to address violations, to those who wish to be placed on a DEQ mailing list, and to the general public concerning proposed environmental projects. La. R.S. 30:2050.1. DEQ determinations are regulatory matters, not civil matters, and are therefore "not within the scope of the district court's constitutional grant of original jurisdiction." Matter of American Waste & Pollution Control Co., 588 So.2d 367, 373 (La. 1991). Generally, the "state cannot and should not bear the costs associated with a private profit making venture" engaged in generating hazardous substances. La. R.S. 30:2271.

A party seeking to challenge DEQ action or inaction must follow the procedures set out in La. 30:2050.11. Judicial review of agency determinations may occur after a final agency decision or order on an adjudication proceeding, and is an exercise of a court's appellate jurisdiction. La. R.S. 49:964; American Waste, 588 So.2d at 373. The extent to which a citizen may challenge agency action is quite limited.

The public notice procedure adopted by the Louisiana legislature is part of DEQ's regulatory framework and is purely a regulatory function. DEQ argues, and the Court agree,s that the plaintiff has failed to avail herself of the limited remedial processes available to her; her attorney appears ignorant of both

the Louisiana Administrative Procedure Act, as well as the citizen suit provisions of La. R.S. 30:2026. If the plaintiff takes issue with a DEQ action or inaction, she may in certain instances intervene in an adjudicatory hearing, ask for a declaratory ruling, or ask for appellate review after a final regulatory decision has been made. To seek damages from the State for exposure to emissions from a private defendant's manufacturing facility ventures into absurdity.

The plaintiff also alleges, in conclusory fashion, that DEQ has acted to shield Denka from liability. The plaintiff alleges no facts concerning how DEQ has shielded Denka nor how the alleged conspiracy has injured her; such conclusory allegations fail to state a plausible claim for relief, let alone satisfy Rule 9(b).

The plaintiff lastly submits that DEQ failed to follow its statutory obligations to routinely test and sample air quality. As a matter of law, under La. R.S. 30:2012, the Secretary of the DEQ shall set up a compliance monitoring strategy to be followed by facilities and permit holders it regulates. The affirmative duty to comply with the strategy and to provide DEQ with monitoring reports, however, lies with the facility and permit holder. And, again, the plaintiff wholly ignores the limited function of judicial review and her limited remedy in this regulatory realm.

She fails to plead any facts that if true entitle her to relief from DEQ.  DEQ's motion to dismiss must be granted.

IV.

The Court now turns to Denka's remaining submission that the plaintiff still fails to plead a plausible claim for relief. Denka contends that the plaintiff's allegations are exceedingly vague. The Court agrees and is compelled to observe that the plaintiff's petition is so inartfully drafted that it is difficult to discern precisely which causes of action she may be advancing.  Denka can only surmise that the plaintiff may be attempting to assert claims for nuisance, negligence, strict liability, absolute liability, and battery. Denka submits that the plaintiff fails to allege sufficient facts and to state any claim under Louisiana law as her petition does not meet the pleading standards set forth in Rule 8 of the Federal Rules of Civil Procedure.

The plaintiff counters that she has alleged plausible claims for negligence, battery, and strict liability (even though these causes of action and supporting elements do not appear in her petition even in conclusory fashion).[8] The Court disagrees. The

---

[8] The Court construes the plaintiff's repeated references to DuPont throughout her Memorandum in Opposition to **Denka's** Motion as references to Denka – the party to whom she is specifically opposing. The Court can only surmise that the error is a case of copy and paste gone wrong.

plaintiff's arguments cannot be transformed into allegations; focusing on the allegations in the complaint, the Court finds that no plausible claim has been stated.[9]

The plaintiff offers a "Factual Background" section in the petition, which offers an overview of the PWF and EPA's designation of chloroprene as a likely human carcinogen. The plaintiff alleges that she has sought medical care since 2012 for various symptoms and alleges that those symptoms were caused by exposure to chloroprene. The plaintiff's attempts, however, to clarify in recent filings the specific causes of action she is pursuing do not remedy the deficient and conclusory allegations set forth in her petition. Apart from a single reference to Louisiana's strict liability law and repeated allusions to the Louisiana Constitution, the petition fails to offer a factual predicate tethered to any cause of action that would permit the Court (and defendants) to decipher which cause(s) of action the plaintiff might be pursuing.

While the plaintiff's petition contains some factual allegations, the narrative is nothing more than "an unadorned, the

_____

[9] The Court observes that a contested motion to amend complaint is pending before Chief Magistrate Judge Roby. Although the proposed amendment adds little in the way of clarification as to which causes of action the plaintiff seeks to allege, it would add numerous additional defendants. The Court does not now weigh in on the motion pending before the magistrate judge.

defendant-unlawfully-harmed-me accusation." Subsequent filings to clarify the plaintiff's causes of action serve only to show the lack of clarity and ambiguity contained in the petition.[10]

The Court turns briefly to address the distinct causes of action the plaintiff now purports to allege.[11]

1.   Negligence, La. C.C. art. 2315

The plaintiff alleges that Denka continues to expose the plaintiff and putative class members to unsafe levels of chloroprene and that Denka negligently failed to inform the plaintiff of the health risks associated with chloroprene exposure. Denka contends that the plaintiff has not offered facts sufficient to plausibly allege that Denka owed a duty to her, whether the nature of the duty was breached, and whether any activity actually caused the plaintiff any damage.

"Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it."  La. Civ. Code art. 2315(A).  "Every person is responsible for the damage he

---

[10] The plaintiff's failure to attempt to identify which cause of action she pursues is particularly egregious under these circumstances where plaintiff's counsel has evidently availed himself of the filings in many other nearly identical chloroprene emissions cases.

[11] The plaintiff's ambiguous petition impedes the Court's ability to decipher what causes of action she pursues. In argument, the plaintiff submits that she has properly pleaded claims for negligence, battery, and strict liability. The Court, therefore, confines its analysis to those three causes of action.

occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." La. Civ. Code art. 2316. Courts employ the duty-risk analysis to determine whether to impose liability based on these broad negligence principles. <u>See</u> <u>Lemann v. Essen Lane Daiquiris</u>, 923 So. 2d 627, 633 (La. 2006). The analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). <u>Id.</u> "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." <u>Id.</u>

Here, the plaintiff fails to allege that Denka had a duty to conform its conduct to a specific legally-enforceable standard. The plaintiff concludes that because Denka's emissions are consistently above 0.2 µg/m³, this has or will cause injuries to her. Without offering any authority for doing so, the plaintiff would have this Court extract a general duty of care from something less than a federal regulation. The plaintiff fails to persuade

the Court to do so.  Even the federal agency that announced this suggested 0.2 μg/m³ threshold disclaims its regulatory or enforcement value.  In fact, the Court takes notice that the EPA warns against using NATA results as an absolute risk measure, cautioning that "NATA is a screening tool, not a refined assessment.  It shouldn't be used as the sole source of information to regulate sources or enforce existing air quality rules,"[12] and it "wasn't designed as a final means to pinpoint specific risk values at local levels.  The results are best used as a tool to help learn which pollutants, types of emissions sources and places should be studied further."[13]  NATA results are not appropriate "to determine exactly how many people are exposed to precise levels of risk or if a certain area is 'safe' or not."[14]  "[Y]ou should avoid using NATA results as an absolute measure of your risk from air toxics."[15]

---

[12]https://www.epa.gov/national-air-toxics-asessment/nata-frequent-questions#background4
[13]https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#results2
[14]https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#results5
[15]https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#results3

Without allegations suggesting the source of an enforceable duty, the plaintiff is unable to plead a plausible claim for negligence.[16]

2. Battery

The plaintiff suggests that she states a claim for battery because she alleges that she was exposed to chloroprene dermally and by inhalation and that Denka should have known that the its emissions were harmful. Denka counters that the requisite intent allegations are missing, dooming this cause of action. The Court agrees.

"A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, is a battery." Caudle v. Betts, 512 So. 2d 389, 391 (La. 1987). "The intention need not be malicious nor need it be an intention to inflict actual damage." Id. "[A]n intentional act requires the actor to either 1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) know that the result is substantially certain to

---

[16] The Court has previously drawn attention to concessions by plaintiffs' counsel in similar cases that the NATA acceptable risk exposure threshold of 0.2 μg/m³ is neither a law nor a regulation, but, rather, is simply guidance concerning alleged effects of chloroprene exposure. See Arlie v. Denka Performance Elastomer, No. 18-7017 (E.D.La. Oct. 15, 2018) (order granting plaintiff's motion to remand).

follow from his conduct, whatever his desire may be as to that result." Batiste v. Bayou Steel Corp., 45 So.3d 167, 168 (La. 2010).

Here, the plaintiff offers up no case literature that supports pursuit of a battery cause of action. The plaintiff merely concludes that Denka "knew or should have known with substantial certainty that the chloroprene would contact the Plaintiffs and such contact would be harmful or offense [*sic*] to them." Even if this generic allegation appeared in the actual petition, and even considering all non-conclusory allegations in the light most favorable to the plaintiff, no battery claim has been plausibly alleged. At most, the plaintiff alleges that Denka continues to manufacture chloroprene without regard to the potential harmful health effects caused by emissions; the plaintiffs do not allege facts that indicate that Denka knew that harm was substantially certain or that Denka consciously desired to harm them by continuing to manufacture chloroprene and allowing emissions to exceed the 0.2 μg/m³ threshold.[17]

---

[17] The plaintiffs' exaltation of the .2 NATA figure -- the allegation's premise that emissions above this level are unsafe and below it are safe enough -- likewise undermines their attempt to allege the substantial certainty component of their battery claim. The EPA itself cautions that this figure is not an absolute measure of a risk from air toxins. Even if (as it is alleged) Denka knowingly exceeds this so-called threshold, it does not plausibly follow that Denka knew that harm to the plaintiffs was

3.    Strict Liability, La. C.C. arts. 2317-2317.1.

Louisiana Civil Code article 2317 states, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by . . . the things which we have in our custody."  Article 2317.1 provides:

> The owner or custodian of a thing is answerable for damage
> occasioned by its ruin, vice, or defect, only upon a showing
> that he knew or, in the exercise of reasonable care, should
> have known of the ruin, vice, or defect which caused the
> damage, that the damage could have been prevented by the
> exercise of reasonable care, and that he failed to exercise
> such reasonable care.

To prevail on a custodial liability claim, a plaintiff must show: "(1) the object was in the defendant's custody; (2) the thing contained a vice or defect which presented an unreasonable risk of harm to others; (3) the defective condition caused the damage; and (4) the defendant knew or should have known of the defect." Cormier v. Dolgencorp, Inc., 136 Fed.Appx. 627, 627-28 (5th Cir. 2008)(citing La. C.C. arts 2317, 2317.1).  Under Louisiana law, a claim for "strict" liability requires that a duty of care was breached, just as a negligence claim does.  Bd. of Commissioners of Southeast La. Flood Protection Authority-East v. Tennessee Gas

---

*substantially certain* to follow.  As the Louisiana Supreme Court explained, "'[s]ubstantially certain to follow' requires more than a reasonable probability that an injury will occur and 'certain' has been defined to mean 'inevitable' or 'incapable of failing.'" Batiste, 45 So.3d at 168 (citations omitted).  The plaintiffs fall short of alleging an intentional act on the part of Denka.

Pipeline Company, LLC, 850 F.3d 714, 729 (5th Cir. 2017)(citing

Oster v. Dep't of Transp. & Dev., 582 So.2d 1285, 1288 (La. 1991)).

In fact, "[t]here is essentially no difference between the two

types of claims under Louisiana law." Id.  A custodian's duty is

the same as that under the general negligence doctrine of article

2315.  Carroll v. American Empire Surplus Lines Ins. Co., 289 F.

Supp. 3d 767, 771 (E.D. La. 2017)(citation omitted)(Milazzo, J.).

The plaintiff again submits the generic allegation that the
defendant knew or should have known that the emissions were harmful
and in excess of emissions levels. Denka counters that these
allegations are wholly insufficient to plead a claim for strict
liability because the plaintiff fails to allege that the PWF had
a "ruin, vice, or defect that created an unreasonable risk of
harm." The Court agrees.

Paragraph 39 of the petition states:

Denka knew or should have known that said emissions were in
excess of emission levels due to its own assessments,
published MSDS, and warnings from the EPA and others; and
Denka failed to exercise reasonable care as it did not take
measurements of said emission levels until October 2016 and
continues to emit chloroprene above safe levels. As a result,
said Denka is strictly liable under the provisions of
Louisiana Civil Article 2317 for damages caused to plaintiffs
described herein.

The plaintiff fails to allege what "ruin, vice, or defect" created
an unreasonable risk of harm. Simply listing documents and

repeating allegations of what Denka should have known is not sufficient for purposes of a custodial liability claim under article 2317.[18]

Accordingly, for the foregoing reasons IT IS ORDERED: that the defendants' motions to dismiss are GRANTED. The plaintiff's claims are hereby dismissed with the proviso that there is pending before Chief Magistrate Judge Roby a contested motion for leave to file second amended class action petition, and the Court does not purport to interfere with the magistrate judge's proceedings on that remaining motion.

New Orleans, Louisiana, March 13, 2019

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[18] The Court notes that the plaintiff references a 2017 EPA report finding open-ended pipe lines, failure to replace leaking valves, and a lack of monitoring components for leaks at the PWF, but nowhere is it alleged that these features caused her injuries or excessive chloroprene emissions. Rather, it is the plaintiff's focus on Denka's *operations* in exceeding the emissions threshold, which she alleges caused and continues to cause her harm, not a condition of relative permanence inherent in the PWF. She fails to state a claim for strict liability.