UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JUANEA L. BUTLER, *individually and as*                 CIVIL ACTION
*representative of all others similarly situated*

v.                                                      NO. 18-6685

DENKA PERFORMANCE ELASTOMER, LLC, ET AL.                SECTION "F"

ORDER AND REASONS

Before the Court is Denka Performance Elastomer LLC's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the motion is GRANTED.

**Background**

This environmental tort litigation arises from allegedly unsafe emissions of chloroprene, a likely human carcinogen. Neoprene is a synthetic, chemical-resistant rubber manufactured at the Pontchartrain Works Facility (PWF) in St. John the Baptist Parish.  During the neoprene manufacturing process, chloroprene is emitted into the air, allegedly exposing tens of thousands of those living and working in the vicinity of the PWF to its adverse health effects.

E.I. DuPont de Nemours and Company owned and operated the PWF from 1969 until 2015, when DuPont sold the plant to Denka

1

Performance Elastomer LLC.  For decades, it is alleged, the plant has emitted into the air unsafe levels of chloroprene, exposing those who live, work, or attend school near the plant to harm.[1]

Juanea L. Butler has lived and worked near the PWF for years. On behalf of herself and a putative class, she filed suit in state court against the Louisiana Department of Health, the Louisiana Department of Environmental Quality, Denka Performance Elastomer LLC, and E.I. DuPont de Nemours and Company.  In her original and amended class action petitions, Ms. Butler alleged that DuPont and DPE continue to emit unsafe levels of chloroprene, concentrations exceeding the upper limit of acceptable risk.  The plaintiff alleged that DEQ and DOH failed to warn the plaintiff and her community about chloroprene exposure.[2]

---

[1] The Court takes as true any facts alleged in the second amended complaint. Unfortunately, this case has a rather tortured procedural history, which must be addressed. The Court also observes that there are many chloroprene exposure lawsuits, most proceeding in state court (after the Court granted motions to remand based on binding stipulations limiting the plaintiffs' recovery of damages) claiming nuisance and battery and one nuisance lawsuit, which remains pending in this Court.

[2] In her petition, prior to the most recent amendment, she had alleged that:

> Due to the Plaintiff's exposure to the chloroprene emissions, she has experienced symptoms attributable to exposure of said chemical. Since April 2012 until current date, the Plaintiff has continually sought medical attention for the following conditions: acute bronchitis; coughing; throat irritation; redness and swelling; nasal blockage, congestion, and sneezing; sinusitis and nasal polyps; exacerbation of pre-existing asthma; shortness of breath; wheezing;

Seemingly at random, the plaintiff invoked as causes of action general Louisiana state constitutional provisions. She requested injunctive relief in the form of abatement of chloroprene releases to "comply" with the Environmental Protection Agency's suggested metric of acceptable chloroprene emissions, (that is, emissions should stay below .2 micrograms per cubic meter);[3] damages for deprivation of enjoyment of life, medical expenses, lost wages, pain and suffering; punitive damages; and additional damages including medical monitoring.

DPE and DuPont jointly removed the lawsuit, invoking this Court's diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The Court denied the plaintiff's motion to remand. See Order and Reasons dtd. 1/3/19 (denying motion to remand); see Order and Reasons dtd. 2/20/19 (denying motion to reconsider). DuPont, DPE, DEQ, and DOH moved to dismiss the plaintiff's claims. Meanwhile, while the motions to dismiss were pending, the plaintiff moved for leave to amend her complaint; the

---

rhinosinusitis; thyroid enlargement; cardiac problems; nausea; vomiting; headaches; fatigue; epistaxis (nose bleeds); anxiety; depression; insomnia; and temporary hair loss.

[3] The concentration of an air pollutant is measured in units of density. The request for injunctive relief adopts an EPA metric of an acceptable risk exposure threshold for chloroprene: $0.2 \ \mu g/m^3$ (that is, chloroprene emissions should stay below .2 micrograms per cubic meter) to comply with the limit of acceptable risk threshold (which is a risk of 100 in one million people).

contested motion to amend was automatically referred to the magistrate judge. DuPont and DPE opposed the motion to amend on the ground of futility, resorting to the same prescription arguments advanced in the motions to dismiss.

On March 13, 2019, the Court granted all four motions to dismiss; considering that the plaintiff's contested motion to amend complaint had been argued and submitted by this time and was awaiting decision by the magistrate judge, the Court dismissed the plaintiff's claims "with the proviso that there is pending before Chief Magistrate Judge Roby a contested motion for leave to file second amended class action petition, and the Court does not purport to interfere with the magistrate judge's proceedings on that remaining motion." See Order and Reasons dtd. 3/13/19. Two weeks later, with the plaintiff's consent, the defendants moved to extend their deadline to oppose class certification, given that the plaintiff's motion for leave to file a second amended complaint was still pending before the magistrate judge. The Court dismissed the plaintiff's motion for class certification without prejudice, to be re-filed if necessary, pending the completion of proceedings before the magistrate judge.

On April 11, 2019, the plaintiff filed a notice of appeal, ostensibly appealing to the U.S. Court of Appeals for the Fifth Circuit three of this Court's orders: denying the plaintiff's motion to remand (Order and Reasons dtd. 1/3/19), granting the

defendants' motions to dismiss (Order and Reasons dtd. 3/13/19),
and dismissing without prejudice pending the magistrate judge's
ruling the plaintiff's motion for class certification (Order dtd.
4/2/19).  Five days later, the magistrate judge granted in part
and denied in part the plaintiff's motion for leave to file second
amended class action petition, essentially reviving Butler's
claims against DuPont only as to strict liability, granting Butler
leave to amend on a continuing-tort theory of liability as to DPE,
and denying all other attempts to add claims or parties; the April
16th order provided:

>   IT IS GRANTED AS FOLLOWS:
>   1. With respect to paragraph 44 for sufficiently stating
>   a continuing tort claim against Denka (the current owner
>   of the facility);
>   2. With respect to paragraphs 52, 53, 54, 55, 56 for
>   sufficiently stating a claim of strict liability against
>   DuPont as the owner of the land and defective thing.
>
>   IT IS DENIED...AS FOLLOWS:
>   1. With respect to paragraphs 43, 45, 46, 57, 70, and 71
>   of the Second Amended Complaint because the claims of
>   nuisance[] (Civil Code Articles 667, 668, and 669),
>   Civil Battery, Trespass, Product Liability, Negligence
>   and Gross Negligence are prescribed;
>   2. With respect to DEQ for not being within the Court's
>   original jurisdiction and for failing to follow the
>   prescribed administrative procedures;
>   3. With respect to the claims against Pegeon, Glenn,
>   Walsh, Caldwell, Grego and Lavastida are prescribe[d,
>   and] therefore, they are futile;
>   4. The continuing tort allegations against Lavastida
>   fail to state a claim for which relief may be granted
>   and [are] futile[;]
>   5. With respect to LDH for failure to sufficiently allege
>   a continuing tort claim;
>   6. With respect to the conspiracy to commit fraud claims
>   against DEQ, LDH, Lavastida, and the other private

       Defendants for failing to state a claim for which relief
       may be granted.

<u>See</u> Order dtd. 4/16/19.  The magistrate judge further ordered that "Butler shall file into the record a Second Amended Complaint consistent with this Order no later than fourteen (14) days from" April 16, 2019.  Fourteen days later, DuPont timely appealed to this Court the portion of the magistrate judge's April 16, 2019 Order allowing the plaintiff to amend her complaint to state a strict liability claim against DuPont.[4]  But the plaintiff failed to file the second amended complaint by the Court-ordered deadline. Nor did she seek an extension of time to file her second amended complaint.

On May 10, 2019 -- 10 days after the amendment deadline lapsed and without requesting leave -- the plaintiff filed her second amended complaint.  In it, the plaintiff names DPE, DuPont, and "DuPont Performance Elastomers, LLC f/k/a Dupont Dow Elastomers, LLC," allegedly a wholly-owned subsidiary of DuPont.  Butler removed the allegations from the prior iteration of her complaint in which she had alleged that, since April 2012, her exposure to

---

[4] Notwithstanding the fact that DuPont filed its appeal within 14 days of the magistrate judge's ruling (incidentally, the deadline for the plaintiff to file its amended complaint), the plaintiff suggested that DuPont's appeal was untimely.  The Court's admonition to plaintiff's counsel is as apt now as it was then: "Plaintiff's counsel should avoid advancing frivolous arguments that amplify his own dilatory conduct[.]" <u>See</u> Order and Reasons dtd. 6/10/19, p. 10-11 n.4.

chloroprene had caused her to continually suffer and seek medical attention for more than 15 ailments.  In defining the proposed class, Butler seeks to proceed individually and as a representative of a class of persons defined as:

> (1) Those persons who, at any time from January 1, 2011 through the present, have lived, worked, attended school, and/or actually resided within a [defined] geographical boundary of St. John the Baptist Parish...; and
>
> (2) who experienced one or more of the following physical symptoms: headaches; sinus problems; dizziness; insomnia; trouble breathing, respiratory irritation, or other respiratory problems; dizziness; insomnia; trouble breathing; respiratory irritation, or other respiratory problems; chest pains; acute cardiac palpitations; acute gastrointestinal disorder; acute bronchitis; acute onset of asthma; exacerbation of pre-existing asthma; fatigue; nausea; skin rash; temporary hair loss; chronic coughing, chronic nasal discharge; chronic cardiovascular disorder; chronic throat irritation; chronic eye irrigation; chronic thyroid disorder; anxiety; and depression, resulting from their exposure to chloroprene ... and/or chloroprene-containing substances[], emitted released, and/or leaked from the PWF[.]

As in prior iterations of her complaint, the plaintiff alleges that DPE continues to emit chloroprene at levels resulting in concentrations exceeding the upper limit of acceptable risk.  It is alleged that, in December 2015, the Environmental Protection Agency released a screening-level National Air Toxics Assessment, and classified chloroprene as a likely human carcinogen. EPA's NATA evaluation suggested an acceptable risk exposure threshold for chloroprene: 0.2 µg/m³ (that is, chloroprene emissions should

stay below .2 micrograms per cubic meter) to comply with the limit of acceptable risk threshold (which is a risk of 100 in one million people).

As to causes of action in the second amended complaint, Ms. Butler first alleges that the defendants are strictly liable due to the defects, ruins, and vices in the PWF and its neoprene units. "But for the...dangerous characteristics," it is alleged, the plaintiff and putative class members "would not have manifested the medical conditions, illnesses, and/or symptomology that the Plaintiffs have experienced." Second, the plaintiff invokes the doctrine of *res ipsa loquitur*, alleging that the damages suffered by the plaintiffs were caused by the defendants' acts or omissions, which may be "beyond proof" by the plaintiffs, there being no other possible conclusion than the toxic emissions, exposure, and injuries resulted from the negligence of the defendants. Third, the plaintiff includes a "request for declaratory judgment" alleging that the defendants continue to violate the plaintiffs' constitutional rights of general welfare and happiness under the Louisiana constitution; the plaintiff and putative class seek a preliminary (and later, permanent) injunction, enjoining the defendants from emitting chloroprene at levels exceeding .2 micrograms per cubic meter "or at levels in excess of what this Court otherwise finds to be safe or in compliance with the Plaintiffs' forgoing constitutional rights." Finally, the

plaintiffs seek a litany of past, present, and future damages for physical injuries, future emotional distress, pain and suffering, medical monitoring, fear of cancer, lost wages, lost earning capacity, medical expenses and pharmaceuticals, enjoyment of life, annoyance, discomfort and inconvenience, expert fees, punitive damages, attorney's fees, and medical monitoring.

Given DuPont's then-pending Rule 72(a) appeal -- one week after the second amended complaint was filed, on May 17, 2019 -- DPE and DuPont, with the plaintiff's knowledge and consent, requested (and the Court granted as unopposed) an extension of time to file responsive pleadings to the newly-filed second amended complaint. On June 10, 2019, the Court granted DuPont's motion to review the magistrate judge's order; the Court reversed the magistrate judge's April 16, 2019 order in relevant part, thereby disposing of the remaining claim against DuPont by denying as futile the plaintiff's motion to amend her strict liability claim against DuPont. On June 21, 2019, the plaintiff filed another notice of appeal, ostensibly challenging the same rulings previously "appealed" as well as the June 10, 2019 Order and Reasons reversing (in part) the magistrate judge's order.

Facing the second amended complaint, DPE timely moved to dismiss. Refusing to address the substance of DPE's motion, the plaintiff filed an opposition, challenging this Court's jurisdiction and insisting that "[a]ny ruling on DPE's Motion to

Dismiss by this Court would be ultra vires and invalid[,]" and suggesting that DPE filed its motion to dismiss "for improper purposes...while the Court had no jurisdiction over the Plaintiffs' case[.]" Counsel for plaintiff urged the Court "not [to] take and refuse any action...until the Fifth Circuit has disposed of the Plaintiffs' appeals and/or remanded the Plaintiffs' case back to the Court for further action."

On March 20, 2020, the Fifth Circuit determined that this Court's March 19 dismissal order, which was subject to a determination on motion for leave to file amended complaint, was "no final, appealable judgment[;]" accordingly, the court dismissed the plaintiff's appeals for lack of jurisdiction. See Butler v. Denka Performance Elastomer LLC, --- Fed.Appx. ---, 2020 WL 1481613, at *3 (5th Cir. Mar. 20, 2020) ("The proviso in the Order rendered it non-final. And thus we have no jurisdiction to entertain the April or June appeals."). Mandate issued on May 11, 2020. After allowing supplemental papers on DPE's motion to dismiss, the Court now takes it up.

I.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997)(quoting Kaiser

Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Rule 8(a)(2) requires that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014)(citing Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption

that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take

judicial notice." <u>Funk v. Stryker Corp.</u>, 631 F.3d 777, 783 (5th
Cir. 2011)(quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>,
551 U.S. 308, 322 (2007)).  If the Court considers materials
outside of the pleadings, the motion to dismiss must be treated as
a motion for summary judgment under Rule 56.  <u>See</u> <u>Causey v. Sewell
Cadillac-Chevrolet, Inc.</u>, 394 F.3d 285, 288 (5th Cir. 2004); <u>see
also</u> Fed. R. Civ. P. 12(d).

II.

<em>A.</em>

First, DPE moves to dismiss the second amended complaint as
untimely filed.  It is undisputed that plaintiff disregarded the
Court-ordered deadline, filed the second amended complaint 10 days
late, and failed to seek an extension of time or otherwise request
leave to file the untimely pleading.  Plaintiff's counsel's neglect
here is hardly excusable.  Failure to demonstrate excusable neglect
warrants dismissal with prejudice.

Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure allows
courts to alter certain deadlines upon a showing of excusable
neglect: the Court may, "for good cause, extend the time [for
filing]... after the time has expired if the party failed to act
because of excusable neglect."  Four factors inform the excusable
neglect inquiry: (1) prejudice to the opposing party; (2) length
of the delay; (3) reason for the delay; and (4) whether the delay
was made in good faith.  <u>See</u> <u>Silvercreek Mgmt., Inc. v. Banc of</u>

13

Am. Sec., LLC, 534 F.3d 469, 472 (5th Cir. 2008)(citation omitted)(noting that "[a] court may hold a party accountable for the acts and omissions of its counsel" and "if counsel's behavior so thoroughly falls below a certain threshold, a district court's determination regarding excusable neglect will not be disturbed if the court has considered the moving party's proffered evidence."). Neither counsel's ignorance nor mistake of law will support a finding of excusable neglect. To be sure, when the reason for the delay is "misinterpretation[] of the federal rules," such a finding of excusable neglect is a "rare case indeed." Midwest Employers Cas. Co. v. Williams, 161 F.3d 877, 880 (5th Cir. 1998)(quotation omitted). Excusable neglect "encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness." See Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 388-89 (1993)(urging a flexible understanding of "excusable neglect").

Plaintiff's counsel has offered shifting reasons in an attempt to excuse his non-compliance with the Court-ordered deadline for filing the second amended complaint. In July 2019, the plaintiff refused to address the merits of DPE's motion to dismiss, instead insisting that the Court lacked jurisdiction to consider DPE's motion (and, presumably, lacked jurisdiction to consider the plaintiff's untimely and non-merit-focused

14

opposition) because the plaintiff had filed the first of two notices of appeal on April 11, 2019. This, the plaintiff insisted, divested this Court of jurisdiction.[5] The plaintiff offered up this "explanation" for the untimely filed second amended complaint: "the 14-day filing period ... was ... invalid as it was part of the magistrate's Order rendered after this Court had been divested jurisdiction from this case/after Plaintiffs' April 11, 2019 Notice of Appeal [was filed]." (So, by the plaintiff's logic, the magistrate judge, too, lacked jurisdiction to issue her ruling). "[H]ad the Plaintiffs filed their Second Amended Petition within the...14...day limit," the plaintiff added in a puzzling spin on her proffered excuse -- advanced after she had, in fact, filed the tardy second amended complaint -- "that filing would have been of no legal significance/invalid[.]" Yet, the plaintiff had continued to participate in the litigation proceeding in district court (under plaintiff's interpretation, making invalid filings).

---

[5] Even plaintiff's counsel was not convinced of his own (incorrect) postion concerning this Court's purported "divestment" of jurisdiction. The plaintiff continued to participate in these district court proceedings after the first notice of appeal was filed. The plaintiff went on to file the second amended complaint on May 10, 2019 and then to file an opposition to DuPont's motion for review of the magistrate judge's order on May 15, 2019. Counsel for plaintiff also agreed to not contest the defendants' motion seeking an extension of time to respond to the plaintiff's second amended complaint.

Since the Fifth Circuit has determined that it was without jurisdiction to consider the plaintiff's improvident appeals, the plaintiff now offers this reason to excuse the untimely amended complaint:

> [T]he delay occurred because DuPont appealed the Magistrate Judge's order, before the Second Amended Petition was filed, and it was unclear whether DuPont's appeal precluded [its] filing. The delay lasted only until the proper procedural course was determined. Under the circumstances, the delay ought to be treated as excusable, or at least not egregious. Moreover, the delay...could not have prejudiced [DPE, which] responded with a motion to dismiss[.]"

Taking this explanation at face value, it must be noted that the procedural ambiguity of which the plaintiff complains -- DuPont's appeal of the magistrate's order -- was introduced on April 30, 2019, the same deadline for the plaintiff to file the second amended complaint.[6]   Regardless, whichever purported "mistake of law" justification the Court considers, this sort of ignorance does not render neglect excusable.

Plaintiff's counsel's conduct, as illuminated by the procedural history of this case, undermines any attempt to show excusable neglect concerning the untimely second amended complaint.   Nothing outside plaintiff's counsel's control prevented him from filing the second amended complaint within the

---

[6] DuPont's appeal was (timely) filed on the deadline for filing the second amended complaint.   The plaintiff never requested additional time for filing the amended complaint.

deadline imposed by the magistrate judge, or from simply requesting additional time within which to file it.   Failure to request permission to exceed the deadline (and shifting explanations proffered to excuse it) suggest an intent to flout the deadline. That the delay was relatively short (10 days)[7] and DPE was not necessarily prejudiced by the untimely filing itself do not overcome the plaintiff's shifting reasons for the delay or the absence of good faith apparent in the manner and substance of the reasons given for the delay.

Dismissal of the tardy second amended complaint is warranted. Nevertheless, given that the 10-day delay pales in comparison to the considerable delay attendant to the plaintiff's pursuit of improvident appeals (and the accompanying obstinate, selective refusal to participate in these proceedings in the meantime), the Court is inclined to address the substance of DPE's motion.   DPE objects on waiver grounds to consideration of the plaintiff's recently-filed opposition paper.   The Court shall consider all the

---

[7] That the second amended complaint was filed almost 10 months ago, the plaintiff suggests, shows that it was not the plaintiff's untimely filing that delayed this case.   To be sure, it was the plaintiff's improvidently-filed interlocutory appeals (and insistence that the appeals divested this Court of jurisdiction to even consider the merits of DPE's motion to dismiss) that delayed this case.   Only recently did the plaintiff finally address the substance of DPE's motion.

papers.  Doing so reveals that the plaintiff has failed to state a plausible claim for relief.

*B.*

DPE contends that the plaintiff fails to oppose dismissal of certain claims -- any fraud claim, any claim for punitive damages or attorney's fees, or any attempt to pursue the doctrine or *res ipsa loquitur* as a theory of recovery -- and, thus, dismissal is appropriate.  The Court agrees.

The plaintiff does not contest dismissal of any fraud claim; she contends that she does not attempt to allege a fraud claim. In her opposition addressing DPE's arguments favoring dismissal, the plaintiff fails to mention any claim for punitive damages or attorney's fees or any "claim" under a *res ipsa loquitur* theory of recovery;[8] nor does the plaintiff suggest how any attempt to allege such claims survives under the pleading standards specifically or the substantive law more generally.  Because the plaintiff does not oppose dismissal, and because DPE's arguments favoring dismissal have merit, the following claims are hereby dismissed with prejudice as unopposed: any fraud claim; any claim for

---

[8]  The doctrine of *res ipsa loquitur* is merely a rule of circumstantial evidence; it is not properly invoked at the pleading stage as a placeholder for a substantive cause of action.

punitive damages or attorneys' fees; or any attempt to pursue a
*res ipsa loquitur* "claim."[9]

*C.*

Finally, DPE moves to dismiss the plaintiff's only remaining
claims: for strict liability/negligence and the request for
injunctive relief.  DPE contends that the plaintiff's conclusory,
vague, and factually-deficient allegations fail to satisfy the
pleading standard.  The plaintiff opposes dismissal of her strict
liability claim, medical monitoring "claim," and request for
injunctive relief, countering that the second amended complaint
"pleads abundant factual content which, if accepted as true,
creates a reasonable inference that [DPE] is liable."  The Court

---

[9] Invoking prescription, DPE also seeks dismissal of any attempt
to recover for tortious conduct occurring before June 5, 2017.
Insofar as the plaintiff fails to offer any argument in opposition,
the Court agrees that any such claims may be dismissed.  The Court
simply observes that its prior Order and Reasons on dismissal
addressed at length prescription and the continuing tort doctrine.
See Order and Reasons dtd. 3/13/19.  Nevertheless, the alleged
factual predicate was different in the operative complaint.  Then,
the plaintiff had specifically alleged that, since 2012, she had
suffered and sought medical attention for numerous (indeed,
practically all) symptoms associated with and due to chloroprene
exposure.  Now, she appears to abandon this more specific factual
allegation in favor of this: that from 2011 through the present
she and putative class members have experienced at least one
physical symptom (such as headaches, insomnia, anxiety, throat
irritation, and others indicated in the EPA's literature)
resulting from chloroprene exposure.  Given the plaintiff's
failure to address how these changed allegations fare under the
prescription defense or the continuing tort doctrine, DPE's motion
on this issue is granted as unopposed.

disagrees.   As during the last round of motions to dismiss, the Court observes that the plaintiff's second amended petition contains few concrete factual allegations, rendering the narrative nothing more than "an unadorned, the defendant-unlawfully-harmed-me accusation."   Conspicuously absent from the second amended complaint are factual allegations specific to DPE's duty and breach, the plaintiff's exposure, causation, and damages.   In other words, the second amended complaint suffers from similar deficiencies prompting dismissal more than one year ago.  See Order and Reasons dtd. 3/13/19.

   1.   Negligence (La. Civ. Code art. 2315) and
        Strict/Premises Liability (La. Civ. Code arts. 2317-
        2317.1)

   The plaintiff alleges that she and putative class members, while living, working, and attending school near the plant, have been exposed to unsafe levels of chloroprene and that DPE negligently failed to inform the plaintiff of the health risks associated with chloroprene exposure.   DPE contends that the plaintiff fails to provide facts indicating that DPE owed a duty to her, that it breached any duty, and whether any activity actually caused the plaintiff any damage.   The Court agrees.

   "Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it."   La. Civ.

Code art. 2315(A).[10]  "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."  La. Civ. Code art. 2316. Courts employ the duty-risk analysis to determine whether to impose liability based on these broad negligence principles.  See Lemann v. Essen Lane Daiquiris, 923 So. 2d 627, 633 (La. 2006). The analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). Id. "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." Id.

Louisiana Civil Code article 2317 states, "We are responsible, not only for the damage occasioned by our own act,

---

[10] Section (B) of Article 2315 provides, in part:
> Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease.

but for that which is caused by . . . the things which we have in our custody."  A more specific Civil Code provision applies in premises liability cases.  See La. Civ. Code art. 2317.1.  Civil Code Article 2317.1 makes an "owner" or "custodian" of a "thing" liable for damages caused by a "ruin, vice, or defect" in the "thing." See Renwick v. PNK Lake Charles, L.L.C., 901 F.3d 605, 616 (5th Cir. 2018)(citing Bufkin v. Felipe's La., LLC, 2014-0288 (La. 10/15/14); 171 So. 3d 851, 855).  To prevail on a custodial liability claim, the plaintiff must prove "(1) that the thing was in the defendant's custody, (2) that the thing contained a defect [that] presented an unreasonable risk of harm to others, (3) that this defective condition caused damage[,] and (4) that the defendant knew or should have known of the defect." Renwick, 901 F.3d at 616 (citation omitted); Cormier v. Dolgencorp, Inc., 136 Fed.Appx. 627, 627-28 (5th Cir. 2008)(citing La. C.C. arts 2317, 2317.1).

The 1996 amendments to Civil Code Article 2317.1 "'effectively eliminated strict liability . . . turning it into a negligence claim.'" Renwick, 901 F.3d at 616 (quoting Brumaster v. Plaquemines Parish Gov't, 2007-2432 (La. 5/21/08); 982 So. 2d 795, 799 n.1).  So, "there is [now] essentially no difference" between Civil Code Article 2315 and 21317.1 claims. Bd. Of Comm'rs of Se. La. Flood Pr. Auth.-E v. Tenn. Gas Pipeline Co., 850 F.3d 714, 729 (5th Cir. 2017)(Under Louisiana law, a claim for "strict" liability

requires that a duty of care was breached, just as a negligence claim does); Carroll v. American Empire Surplus Lines Ins. Co., 289 F. Supp. 3d 767, 771 (E.D. La. 2017)(citation omitted)(Milazzo, J.).

DPE contends that the plaintiff's tort theory of recovery lacks facial plausibility because she fails to offer factual content to support any of the elements of her claim, which would allow the Court to draw the reasonable inference that DPE is liable for the alleged misconduct (operating the plant in such a way as to permit continuous harmful emissions). The plaintiff counters that she sufficiently alleges actual harm, lack of care, harmful emissions, and unreasonable risk.

As for the duty and breach components of the tort cause of action, DPE contends that the plaintiff fails to allege that DPE had a duty to conform its conduct to a specific legally-enforceable standard (or any corresponding duty to warn the plaintiff concerning its business operations) and that it breached that duty. Mindful that there exists a duty of reasonable care to avoid harming another, given the sparse and speculative allegations of the second amended complaint, the Court agrees.

Turning to consider the allegations of the second amended complaint -- which is neither short nor plain -- the plaintiff includes extensive expository facts concerning chloroprene and epidemiological studies devoted to understanding the health

effects of exposure, particularly by industry workers.  The plaintiff offers background sections such as "health hazards from exposure to chloroprene," "defendants' knowledge of...hazards from exposure[,]" "Non-Compliance with Permits"; a sampling illuminates the abstract nature of the allegations:

- Chloroprene is a flammable liquid with a pungent odor.
- According to the Occupational Safety and Health Administration, chloroprene emits highly toxic fumes of chlorine gas into the air, causing eye, skin, and respiratory system irrigation.
- Epidemiological studies show the health effects of human exposure to chloroprene [citing symptoms and ailments].
- DHH published a report in 2015 finding that East St. John the Baptist Parish Elementary School in Reserve, Louisiana is located in an "high risk area" for exposure to airborne particulates and the risk of chemical releases following a study after a report of asthma-like respiratory symptoms being reported in 20-24 students each day on two occasions (9 days in September, 2015 and 3 days in October, 2015).
- For the first 10 days of March 2016, sample testing conducted at several schools, a hospital, and a levee in the area by the EPA and DEQ "showed that chloroprene was detected in ambient air samples in the neighborhood sampling locations."
- In December 2015, the EPA released a screening-level National Air Toxics Assessment and classified chloroprene as a likely human carcinogen. EPA's NATA evaluation suggested an acceptable risk exposure threshold for chloroprene: 0.2 µg/m³ (that is, chloroprene emissions should stay below .2 micrograms per cubic meter) to comply with the limit of acceptable risk threshold (which is a risk of 100 in one million people).
- On information and belief, the amount of chloroprene emitted from the PWF has historically resulted in chloroprene air concentration in the defined areas that have far exceeded and continue to far exceed the threshold.  Air sampling within the defined areas since 2016 by the EPA and Denka have revealed excessive chloroprene concentrations in 2016, 2017, and 2018; and based on Denka's own air modeling of concentrations going back to 2011, concentrations have remained higher than what Denka itself recommended as an acceptable level.

- The results of a compliance inspection of the PWF (conducted by the EPA's National Enforcement Investigation Center in 2016) published on April 3, 2017 reveals multiple areas of apparent noncompliance of DPE with the permits issued to the facility and with the applicable state regulations since 1997 or earlier, which has contributed to the cause of the harmful emissions.
- DPE entered into an Administrative Order on Consent with DEQ on January 6, 2017, agreeing to take steps to attempt to reduce chloroprene emissions by 85% (which would still result in emission levels above the EPA's 0.2 µg/m³ threshold), yet DPE refused to acknowledge to its neighbors that the facility emitted unsafe levels of chloroprene.
- On information and belief, the dangers of chloroprene and other hazardous pollutants emitted by the PWF and the health risks associated with exposure to chloroprene was readily available, and well-respected groups had already classified the chemical as likely being carcinogenic years before.

As to DPE's conduct, in addition to these "background" allegations,

the plaintiff alleges that:

- "[t]he continuous, daily exposure to unsafe levels of chloroprene and other hazardous toxins in the ambient air...continues to harm the Plaintiffs, as each day of exposure results in an increased likelihood of developing new and exacerbated physical injuries, conditions, and/or illnesses such as those listed in the proposed class definition[.] Until Denka's emission are reduced to safe levels, the Plaintiffs will continue to suffer successive damages."
- DPE's "acts and omissions proximately caused...the continual emissions of harmful [chloroprene] concentrations[;] the Plaintiffs [sic] exposure to hazardous doses of chloroprene and [other hazardous pollutants and DPE] continue[s] on a daily basis to emit chloroprene in amounts that continue to create an unreasonable and foreseeable risk of harm to Plaintiffs."
- DPE's "acts and omissions proximately caused...actual, continual and successive damages suffered by the Plaintiff...in forms including but not limited to: personal and/or physical injury, emotional distress, loss of income, fear of cancer and other health conditions[.]"

The plaintiff claims that the unreasonable risk of harm was reasonably foreseeable to DPE (because DPE had information and studies showing the hazardous health effects of chloroprene exposure), that DPE should have taken steps to prevent the unreasonable risk of harm, and that DPE's acted in violation of state laws and parish ordinances.

The plaintiff's allegations lack the sort of factual content required to state a plausible negligence claim. As to the duty and breach elements, the plaintiff appears to invoke the EPA's NATA figure as the source of DPE's duty to keep chloroprene emissions below a designated level, a regulatory threshold. But, as DPE correctly contends, the Court has previously declined to extract a general standard of care from something less than a federal regulation. See, e.g., Order and Reasons dtd. 3/13/19.

So long as chloroprene emissions consistently exceed 0.2 µg/m³, the plaintiff seems to suggest, DPE breaches a duty of care that causes injuries to her and putative class members. But the plaintiff fails to cloak her generic theory with facts that allow the Court to reasonably draw the inference that DPE is obliged to (and has failed to) keep emissions below the 0.2 µg/m³ threshold (or has otherwise failed to warn the plaintiff concerning emission levels). Even the federal agency that announced this measure disclaims its regulatory or enforcement value: the EPA warns against using NATA results as an absolute risk measure, cautioning

26

that "NATA is a screening tool, not a refined assessment.  It shouldn't be used as the sole source of information to regulate sources or enforce existing air quality rules,"[11] and it "wasn't designed as a final means to pinpoint specific risk values at local levels.  The results are best used as a tool to help learn which pollutants, types of emissions sources and places should be studied further."[12]  NATA results are not appropriate "to determine exactly how many people are exposed to precise levels of risk or if a certain area is 'safe' or not."[13]  "[Y]ou should avoid using NATA results as an absolute measure of your risk from air toxics."[14]  Far from heeding these warnings, the plaintiff anchors her theory of recovery to this imprecise measure of "safety."[15]

---

[11]        https://www.epa.gov/national-air-toxics-asessment/nata-frequent-questions#background4
[12]        https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#results2
[13]        https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#results5
[14]        https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions#results3

[15]  The plaintiff overstates the significance of guidelines promulgated by regulatory or advisory bodies; such guidelines cannot be adopted as the source of a duty under tort law.  Cf. Johnson v. Arkema, Inc., 685 F.3d 452, 464 (5th Cir. 2012)(citation omitted).  Albeit in a different procedural posture, the Fifth Circuit has helpfully observed:

> Regulatory and advisory bodies such as...[the] EPA utilize a "weight of the evidence" method to assess the carcinogenicity of various substances in human beings and suggest or make prophylactic rules governing human exposure.  This methodology results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances.  *The agencies'*

The plaintiff's complaint that DPE emits excessive concentrations of chloroprene is anchored to a regulatory body's wholesale prophylactic measurement, notwithstanding that the figure was not designed to pinpoint specific risk values at local levels like St. John the Baptist Parish.  To be sure, the premise of the plaintiff's contention is that emissions above this level are unsafe and, below it, are safe enough.  But using this measurement as the source for determining DPE's duty (and its breach) is entirely speculative; the EPA itself cautions that this figure is not an absolute measure of a risk from air toxins.  Yet, this is the purpose for which it is offered by plaintiff.[16]  Viewing this and all allegations in the light most favorable to the plaintiff, the factual content pleaded by the plaintiff does not allow the Court to draw the reasonable inference that the defendant

---

> *threshold of proof is reasonably lower than that appropriate in tort law*, which "traditionally make[s] more particularized inquiries into cause and effect" and requires a plaintiff to prove "that it is more likely than not that another individual has caused him or her harm."
>
Id. (emphasis in original).

[16] Although the plaintiff herself likewise seems open to the possibility that there might be some other measure quantifying "safe" emissions. See, e.g., Paragraph 48 of the Second Amended Complaint: "[T]he Plaintiffs request that this Honorable Court issue a preliminary injunction ... enjoining it ... from ... emitting ... chloroprene into the air from the PWF at levels in excess of 0.2 micrograms per cubic meter *or at levels in excess of what this Court otherwise finds to be safe or in compliance with the Plaintiffs' forgoing constitutional rights*." (emphasis added); allegations embracing sources opining on the OSHA permissible exposure limit, supra.

exceeds this emission threshold and therefore breaches its duty not to exceed a permissible emission level that could endanger the plaintiff's health.

DPE also notes that the plaintiff's own sources incorporated in her complaint demonstrate the implausibility of her duty and breach theory. The Court agrees. The plaintiff alludes to another measure of permissible exposure. There is a vast disparity between the .2 micrograms per cubic meter level and another standard embraced by another agency, the Occupational Safety and Health Administration. The plaintiff describes chemical and physical properties of chloroprene gleaned from the "Hazardous Substances Data Bank," published by the U.S. National Library of Medicine, and DPE attaches (as part of the pleadings) an excerpt of the information pertinent to the OSHA Permissible Exposure Limit included in the entry for chloroprene in the HSDB. The OSHA PEL is a regulatory figure of 25 parts per million, or 90 milligrams per cubic meter, which is the equivalent of 90,000 micrograms per cubic meter. (This figure is 450,000 times more than .2 micrograms per cubic meter, which is the plaintiff's other alleged "acceptable" exposure limit). The plaintiff's adoption of these sources as part of her pleadings introduce yet another ambiguity and detracts from her attempt to plausibly suggest that .2 micrograms per cubic meter represents a "safe" exposure threshold to which DPE must conform emissions. Absent any plausible metric

against which to measure the "safety" of DPE's chloroprene emissions, the plaintiff's allegations concerning DPE's duty and breach are conclusory and speculative.

On the sparse facts alleged, the plaintiff's theory that DPE owed a duty not to exceed a certain level of emissions and breached that duty is not plausible; the plaintiff has not pled facts supporting a plausible claim for negligence.[17]   This, alone, warrants dismissal of any cause of action for negligence. Nevertheless, the Court will consider DPE's related challenges to the sufficiency and plausibility of the plaintiff's causation and damages allegations.  If the gist of the plaintiff's negligence theory is that DPE should take care with harmful toxins, there are no facts suggesting it has failed to do so or that its failure has caused actual concrete harm to the plaintiff.

The plaintiff must allege some plausible basis to reasonably infer a causal link between chloroprene exposure and the plaintiff's alleged harm or damages.  It does not suffice to simply conclude that: DPE continuously emits chloroprene from the PWF during neoprene manufacturing; chloroprene is harmful to health

---

[17]  The Court has previously drawn attention to concessions by plaintiffs' counsel in similar cases that the NATA acceptable risk exposure threshold of 0.2 μg/m³ is neither a law nor a regulation, but, rather, is simply guidance concerning alleged effects of chloroprene exposure. See Arlie v. Denka Performance Elastomer, No. 18-7017 (E.D.La. Oct. 15, 2018)(order granting plaintiff's motion to remand).

when exposed at certain levels and may cause certain symptoms such
as headaches; the plaintiff lives in the area and, since 2011, has
experienced a headache or respiratory ailment, or any number of
other symptoms listed by the EPA.  Factual allegations must raise
the right to relief above the speculative level.

That the plaintiff resorts to spilling pages of ink devoted
to epidemiological research spanning decades studying the harm
presented by chloroprene (particularly to industry workers
exposed) underscores the abstract nature of the causation and harm
allegations in this particular case.  The plaintiff essentially
directs the Court to consider studies, articles, and regulatory
bodies' toxicological assessments forming the basis for warnings
of health risks against exposure to chloroprene at certain levels.
These, the plaintiff suggests, show that chloroprene *could* cause
all of the health issues and symptoms listed (by the EPA, and
copied and pasted) by the plaintiff in the second amended
complaint.  To be sure, the scientific literature suggests that
exposure to certain density levels of chloroprene could cause any
number of symptoms and ailments from transient and mild to severe
and fatal.  What's missing are concrete factual allegations that
would form a factual predicate to recovery here.  That chloroprene
was detected in ambient air samples in the neighborhood sampling
locations combined with the only "personal injury" allegations --
that the plaintiff and putative class members experienced one or

31

more of a list and variety of symptoms or ailments since 2011 --
stops short of the line between possibility and plausibility of
entitlement to relief.

The plaintiff underscores her generic allegation that the
defendant knew or should have known that the emissions were harmful
and in excess of safe levels.  At Paragraph 35 of the second
amended complaint, the plaintiff alleges: "the defects, ruin,
and/or vices listed immediately above...in or on the premises of
the PWF and its neoprene units amounted to a dangerous condition
upon said premises and created an unreasonable risk of harm to the
Plaintiffs, given that it was highly likely that by using the
neoprene units while it contained the aforementioned defects,
excessive and dangerous amounts of chloroprene would" be emitted.
DPE counters that these allegations are wholly insufficient to
plead a claim for strict liability because the plaintiff fails to
plead facts indicating that the PWF had a "ruin, vice, or defect
that created an unreasonable risk of harm"; that the plaintiff
fails to plead facts indicating it was the alleged defects that
actually caused harm; and the plaintiff's allegations concerning
"excessive and dangerous amounts" of chloroprene is anchored to
the NATA figure, which this Court has already concluded is not an
appropriate measure of risk or tort duty. The Court agrees.[18]

_____

[18] Insofar as the plaintiff references a 2017 EPA report finding
open-ended pipe lines, failure to replace leaking valves, and a

This is not a single-incident chemical release case in which an unexpected leak of toxic chemicals led to sheltering in place and imminent traceable symptoms in temporal proximity to the unusual event.[19]  Rather, the plaintiff seeks to recover for DPE's consistent operations of the PWF in which it is alleged that DPE emits chloroprene at unsafe levels, exposing the plaintiff (since 2011) to some unquantified level of chloroprene and causing her to suffer "one or more" of the commonly occurring symptoms.  She fails to identify any facts to support her conclusions that she has been harmed or damaged by chloroprene exposure.[20]  The only facts specific to the plaintiffs are that since 2011 in a certain zone

_____

lack of monitoring components for leaks at the PWF, she does not allege that these features of the plant caused her injuries or excessive chloroprene emissions.  Rather, the plaintiff focuses on DPE's *operations* in exceeding the emissions threshold, which she alleges caused and continue to cause her harm, not a condition of relative permanence inherent in the PWF.

[19] In toxic exposure cases, the plaintiff must allege physical injuries to recover personal injury damages; the plaintiff must allege facts indicating that it is more probable than not that the personal injury of which the plaintiff complains was caused by the defendant's conduct.  The closest the plaintiff comes to alleging facts regarding chloroprene exposure and temporal onset of symptoms is with a passing anecdote to schoolchildren (relocated in close proximity to the plant) who experienced asthma-like symptoms during two short time periods in 2015.  This anecdote references concrete symptoms and indicates some basis for attributing to exposure to chloroprene (given the suggestion that the school had been located in close proximity to the plant).  Ms. Butler herself offers no similar concrete facts regarding her exposure experience.

[20] Despite the plaintiff's allegation that "[c]hloroprene is a flammable liquid with a pungent odor", there are no allegations that any plaintiff has physically perceived chloroprene.

near the PWF, the plaintiff and others living, working, or attending school have "experienced one or more of the following physical symptoms [such as headaches and sinus problems] resulting from their exposure to chloroprene... emitted... from the PWF[.]" In the second amended complaint, Ms. Butler does not specify which one (or more) of the listed symptoms (which appear to be copy and pasted from the EPA's 1985 report summarizing potential health effects of chloroprene exposure) she has personally experienced, let alone onset or frequency. The plaintiff alleges that emissions exceeding the NATA threshold leads to exposure creating some unquantifiable increased risk of cancer; there are no allegations that the plaintiff or any putative class member has cancer or will likely be so diagnosed in the future as a result of chloroprene exposure.

That no facts are alleged to indicate the plaintiff's personal experience is glaring in this, a personal injury lawsuit. This is neither a citizen suit nor an enforcement action brought by the EPA seeking to enforce clean air laws or regulations. Personal injury plaintiffs must allege *facts* supporting their personal injury claims. It does not suffice to allege that a potentially harmful toxin is emitted during the manufacturing process and toxicology studies suggest that, at certain levels, it may cause harms ranging from headaches and respiratory irritation to cancer. It does not suffice to conclude that DPE's wrongful conduct

(measured against some unknown standard) more likely than not caused them personal injuries.[21] Abstract allegations that she and others suffered at least one of many (common and transient) symptoms due to living, working, attending school near the PWF during the past 9 years are merely threadbare "impersonal injury" allegations. To say that studies indicate a list of ailments could follow from exposure does not suffice to state a claim to recover for a specific person's exposure to an unknown level of toxin.[22] Is it possible that the plaintiff suffered from headaches (or any number of a list of symptoms) attributable to chloroprene exposure based on the allegations in the complaint? It is possible. Based

---

[21] In exposure cases, ultimately the plaintiff will require scientific evidence to support the causation element of her claim. This goes for both specific and general causation. The scientific research invoked by the plaintiff in her second amended complaint fails to plausibly support her causation theory. In Allen v. Pennsylvania Engineering Corp., the Fifth Circuit noted that "[s]cientific knowledge of the harmful level of exposure, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." 102 F.3d 194, 199 (5th Cir. 1996)(citation omitted). Translated to the pleadings stage, the plaintiff fails to plead any facts suggesting the harmful level of exposure (just that emissions exceed a certain threshold that this Court cannot apply as a legal standard, or she leaves it open to the Court to determine a "safe" level; the plaintiff herself does not allege that she was exposed to a quantifiable "harmful" level, just that any level above the EPA threshold is unsafe.

[22] When causation involves a link between a disease or health ailment and exposure to a toxin, the exposure must be quantified. To be sure, at a later stage of litigation, the plaintiff would be required to prove the levels of exposure that are hazardous to persons generally as well as the plaintiff's actual level (and duration) of exposure to the defendant's toxic substance.

on the EPA guidance, chloroprene exposure may cause one to suffer a headache or any one or more of an-EPA-approved list of symptoms. But something more than possibilities and speculation is required at the pleading stage.  Absent concrete factual allegations indicating that the plaintiff has been exposed to statistically significant or provably harmful quantities of chloroprene, then at best she alleges an unquantified, theoretical increased risk of injury or illness.[23]

### 2. Request for Injunctive Relief

Finally, DPE contends that the plaintiffs fail to allege the necessary factual and legal elements required to state a plausible claim for injunctive relief.  The Court agrees.

Rule 65 of the Federal Rules of Civil Procedure sets forth the general procedure applicable to the pursuit of injunctive relief and orders enjoining offending conduct.  <u>See</u> Fed. R. Civ. P. 65.  The substantive prerequisites applicable to proving

---

[23] Because the plaintiff has alleged no facts indicating that she has cancer or facts indicating she has an increased risk of contracting cancer due to cancer-causing levels of chloroprene exposure, there is likewise no plausible "claim" for medical monitoring.  Article 2315 of the Louisiana Civil Code was amended in 1999 to provide that "[d]amages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease."

entitlement to injunctive relief are well-settled in the case literature:

> "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

Monsanto Co. v. Geerston Seed Farms, 561 U.S. 139, 156-57 (2010); Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 32 (2008)(citation omitted)(observing that the standards applicable to requests for preliminary and permanent injunctive relief "are essentially the same ... with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success" when seeking a preliminary injunction.).

In a section labeled "Request for Declaratory Judgment," the plaintiff seeks an injunction prohibiting DPE from "discharging, emitting, and/or releasing chloroprene into the air from the PWF at levels in excess of 0.2 micrograms (mcg) per cubic meter or at levels in excess of what this Court otherwise finds to be safe or in compliance with the Plaintiffs' forgoing [sic] constitutional rights."

Here, among other pleading deficiencies, the plaintiff fails to allege any "specific facts" indicating an irreparable injury. See ITT Educational Services, Inc. v. Arce, 533 F.3d 342, 347 (5th Cir. 2008)(citation omitted). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir. 1985)(citation omitted). If monetary compensation will make the plaintiff whole, the injury is not irreparable. Dixie Brewing Co., Inc. v. U.S. Dept. of Veterans Affairs, 952 F. Supp. 2d 809, 813 (E.D. La. 2013)(citing Bluefield Water Ass'n v. City of Starkville, Miss., 577 F.3d 250, 253 (5th Cir. 2009)).

Additionally, absent a plausible substantive claim, the plaintiff's request for injunctive relief, just like the request for monetary damages, must be dismissed. See Pajooh v. Harmon, 82 Fed.Appx. 898, 899 (5th Cir. 2003). There are simply no claims remaining for the plaintiff to pursue the extraordinary remedy of an injunction. The request for injunctive relief must be dismissed because the plaintiff has not stated any claim upon which any relief could be granted.

***

In conclusion, the Court underscores that this is neither a regulatory enforcement action nor a citizen compliance lawsuit;

this is a personal injury case.  The plaintiff offers no individualized allegations regarding her experience with chloroprene exposure.  The factually-deficient and patently speculative nature of the plaintiff's causation theory and generic personal injury damage allegation seems to be a function of the pages devoted in her complaint to epidemiological studies, shortcomings or uncertainties attendant to air quality testing, and the nature and quality of the symptoms and ailments (including cancer) that possibly could befall someone attributable to (some uncertain) level of chloroprene exposure.  These features of the science underlying such claims...seeking to attribute emissions to disease...complicate proof (and, it follows, pleading); simply put, litigable cases and controversies call for concretization of the abstract epidemiological studies and air quality research invoked by the plaintiff in her complaint.  What is difficult to concretely prove is necessarily difficult to allege.[24]

Another chloroprene exposure case illustrates the point.  Others suing DPE for excessive chloroprene emissions have specifically disclaimed any personal injury claims as "immature" and the Court dismissed any alleged "immature torts" as unripe.

---

[24] This is not to say that it cannot be done.  To be sure, there are many toxic exposure personal injury cases filed; and there are even chloroprene exposure cases claiming nuisance and battery (and perhaps other causes of action), which are proceeding in state court.

See <u>Taylor v. Denka Performance Elastomer LLC</u>, 332 F. Supp. 3d 1039 (E.D. La. 2018).  There, the plaintiffs attempted to "reserve their rights to assert claims for damages due to any personal injury...from exposure to chloroprene emissions, should such injury or damage become manifest and such claims ripen and no longer be immature torts."  This Court dismissed any such "immature tort" claims without prejudice, finding that such claims were not yet ripe due to, among other things, an absence of any alleged factual predicate supporting personal injury damage caused by exposure to chloroprene emitted from the PWF.

The <u>Taylor</u> plaintiffs candidly conceded that they could not prove a causal link between chloroprene exposure and personal injury and thus they disclaimed such damages.  The Court agreed that the plaintiffs' allegations were deficient.  "The plaintiffs' allegations that chloroprene emissions have caused mutagenic metabolites to reside in their bodies is entirely speculative[.]"  <u>Id.</u> at 1056 (noting that plaintiffs "merely recite and intone generic and formulaic conclusions. Another point of deficiency is the absence of any individualized allegations regarding each plaintiff's experience.").  So, too, here.  It is not the quantity of allegations that is lacking here; it is the factual quality.  What's missing in the second amended complaint are any allegations concerning how DPE's emissions of chloroprene are harmful (in a

concrete, not abstract way) and any allegations personalizing the alleged injury: each plaintiff's (or the named plaintiff's) experience in her exposure to chloroprene and resulting ailments.

The Court has no doubt that the St. John residents' health and air quality concerns due to their proximity to their industrial neighbor are sincerely felt. But concerns do not become compensable causes of action absent factual allegations (followed later by proof) breathing life into the *concepts* alleged: harm caused by DPE's unreasonable, unsafe conduct. As presented, in conclusory and abstract form, the allegations in the second amended complaint are speculations devoid of concrete facts, which create a roadblock to advancement to the discovery stage.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the motion to dismiss is GRANTED. The claims in the second amended complaint are hereby dismissed with prejudice.

New Orleans, Louisiana, May 27, 2020

_____

MARTIN L. C. FELDMAN

UNITED STATES DISTRICT JUDGE